**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JAVELIN CAPITAL MARKETS LLC and
JAVELIN SEF, LLC,

                              Plaintiffs,

              -against-

BANK OF AMERICA CORPORATION; BANK OF
AMERICA, N.A.; MERRILL LYNCH, PIERCE,
FENNER & SMITH INCORPORATED; BARCLAYS
PLC; BARCLAYS BANK PLC; BARCLAYS
CAPITAL INC.; BNP PARIBAS, S.A.; BNP PARIBAS
SECURITIES CORP.; CITIGROUP, INC.; CITIBANK
N.A.; CITIGROUP GLOBAL MARKETS INC.;
CITIGROUP GLOBAL MARKETS LIMITED;
CREDIT SUISSE AG; CREDIT SUISSE GROUP AG;
CREDIT SUISSE SECURITIES (USA) LLC; CREDIT
SUISSE INTERNATIONAL; DEUTSCHE BANK AG;
DEUTSCHE BANK SECURITIES INC.; THE
GOLDMAN SACHS GROUP, INC.; GOLDMAN,
SACHS & CO.; GOLDMAN SACHS BANK USA;
GOLDMAN SACHS FINANCIAL MARKETS, L.P.;
GOLDMAN SACHS INTERNATIONAL; HSBC
BANK PLC; HSBC BANK USA, N.A.; HSBC
SECURITIES (USA) INC.; ICAP CAPITAL
MARKETS LLC; J.P. MORGAN CHASE & CO.; J.P.
MORGAN CHASE BANK, N.A.; J.P. MORGAN
SECURITIES LLC; J.P. MORGAN SECURITIES PLC;
MORGAN STANLEY; MORGAN STANLEY BANK,
N.A.; MORGAN STANLEY & CO. LLC; MORGAN
STANLEY CAPITAL SERVICES LLC; MORGAN
STANLEY DERIVATIVE PRODUCTS INC.;
MORGAN STANLEY & CO. INTERNATIONAL
PLC; MORGAN STANLEY BANK
INTERNATIONAL LIMITED; THE ROYAL BANK
OF SCOTLAND GROUP PLC; ROYAL BANK OF
SCOTLAND PLC; RBS SECURITIES INC.;
TRADEWEB MARKETS LLC; UBS AG; and UBS
SECURITIES LLC,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index No. 16 Civ. 3542

**<u>COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

OVERVIEW OF THE ACTION ....................................................................................1

PARTIES ....................................................................................................................8

    A.    Plaintiffs ......................................................................................................8

    B.    Defendants ..................................................................................................9

JURISDICTION AND VENUE .................................................................................17

FACTUAL ALLEGATIONS ....................................................................................18

I.      THE MARKET FOR INTEREST RATE SWAPS ........................................18

    A.    The Trading of Interest Rate Swaps............................................................18

    B.    The Dodd-Frank Act ...................................................................................22

II.     JAVELIN'S CREATION OF AN ALL-TO-ALL EXCHANGE-LIKE INTEREST
       RATE SWAPS TRADING PLATFORM ........................................................24

III.    DEFENDANTS CONSPIRED TO BOYCOTT JAVELIN AND OTHER ALL-
       TO-ALL EXCHANGE-LIKE TRADING PLATFORMS ................................26

    A.    The Dealer Defendants Boycotted Javelin...................................................29

    B.    The Dealer Defendants Boycotted Other Exchange-Like Trading
          Platforms ....................................................................................................36

         1.    The Dealer Defendants boycotted TeraExchange.....................................36

         2.    The Dealer Defendants boycotted trueEX .................................................38

    C.    The Dealer Defendants Collectively Refuse to Clear Trades From Javelin
          and Other Exchange-Like Trading Platforms ...........................................40

    D.    The Dealer Defendants Deter Buy-Side Customers From Trading on
          Javelin and Other Exchange-Like Trading Platforms...............................44

         1.    The Dealer Defendants withhold clearing services to buy-side
             firms that attempt to trade on Javelin and other exchange-like
             platforms .................................................................................................44

         2.    The Dealer Defendants insist on "name give-up" to deter buy-side
             participation on exchange-like platforms.................................................46

         3.    The Dealer Defendants place transgressors in the "penalty box".............54

E.     The Dealer Defendants' Boycott Has Chilled Market Progress ...........................57

IV.    DEFENDANTS' OTHER EFFORTS TO BLOCK EXCHANGE-LIKE
       TRADING OF INTEREST RATE SWAPS.......................................................58

       A.     The Dealer Defendants Took Control of Tradeweb to Prevent the
              Development of a More Competitive Trading Platform.......................................58

       B.     The Dealer Defendants Utilize Other Forums to Collude ....................................66

       C.     The Dealer Defendants Prevent Interdealer Brokers From Opening
              Exchange-Like Platforms to the Entire Market ....................................................68

       D.     The Dealer Defendants Prevent Clearinghouses from Bringing Exchange-
              Like Trading to the Market ...................................................................................74

V.     ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD
       PREDOMINANTLY TRADE ON JAVELIN AND OTHER EXCHANGE-LIKE
       TRADING PLATFORMS .................................................................................76

       A.     Relevant Market...................................................................................................76

       B.     The Dealer Defendants Have Substantial Market Power .....................................77

       C.     Defendants' Conspiracy Robbed Javelin of Substantial Profits ...........................78

       D.     Absent Collective Action, It Would Have Been Economically Rational for
              Individual Defendants to Support Structural Changes...........................................79

       E.     Investigations and Litigation Concerning the Credit Default Swaps Market
              and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants
              to Manipulate Various Aspects of the Financial System .....................................80

              1.     The Dealer Defendants' Misconduct in the Credit Default Swaps
                     Market ........................................................................................................81

              2.     The Dealer Defendants' Manipulation of ISDAfix ..................................84

VI.    EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO
       DEFENDANTS' CONCEALMENT OF THE CONSPIRACY .......................................85

CAUSES OF ACTION .................................................................................................87

FIRST CAUSE OF ACTION (VIOLATION OF SECTION 1 OF THE SHERMAN
       ACT) .........................................................................................................................87

SECOND CAUSE OF ACTION (VIOLATION OF THE DONNELLY ACT)..........................88

THIRD CAUSE OF ACTION (UNJUST ENRICHMENT) ..........................................................89

FOURTH CAUSE OF ACTION (TORTIOUS INTERFERENCE WITH BUSINESS
          RELATIONS)................................................................................................................89

PRAYER FOR RELIEF ............................................................................................................89

JURY DEMAND.......................................................................................................................91

Plaintiffs Javelin Capital Markets LLC and Javelin SEF, LLC (together, "Javelin" or "Plaintiffs"), by and through their attorneys, bring this action against Defendants, and allege as follows:

## OVERVIEW OF THE ACTION

1.      This case concerns a conspiracy among major interest rate swaps ("IRS") dealers (the "Dealer Defendants") to boycott Plaintiffs in order to undermine increased competition in the IRS market and thereby maintain the Dealer Defendants' massive profits.[1]  By boycotting and thus destroying Plaintiffs' trading platform, Defendants have succeeded in blocking IRS customers such as pension funds and municipalities from enjoying the benefits of greater price transparency and competition.  Defendants used a variety of mechanisms, including blocking anonymous trading, to promote their conspiracy and ensure that only the Dealer Defendants had access to competitive and transparent pricing for IRS.

2.      An IRS is a type of derivative.  It is an agreement between two parties to trade interest-rate cash flows on a specific amount of money for a fixed period of time.  The most common type of swap — often referred to as a plain vanilla swap — is one in which one counterparty pays the other a fixed interest rate in exchange for a floating interest rate.  The counterparty paying a fixed rate is typically referred to as the "buyer," and the counterparty making payments at the floating rate is known as the "seller."  The value of the contract to each side moves (in opposite directions) depending on changes in interest rates.

3.      IRS are an important financial tool used by an array of investors to manage risk and protect themselves against fluctuating interest rates.  For example, a municipality that issued

---

[1]   As defined more fully below, the Dealer Defendants are Bank of America, Barclays, BNPP, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Morgan Stanley, RBS, and UBS.

a floating-rate bond to pay for a clean-water project might later use an IRS to convert floating-rate payments on the bond into fixed payments in order to hedge against interest-rate increases. IRS comprise one of the largest financial markets with billions of dollars in swaps traded each day.

4.     Non-dealers seeking to trade IRS ("buy-side customers") have historically been limited to a dark and inefficient over-the-counter ("OTC") market where the buy-side customers must individually contact the Dealer Defendants for price quotes.  The Dealer Defendants take advantage of this opaque market to command large profits by entering into IRS with buy-side customers while simultaneously having access to better prices for the same IRS products through trades with other buy-side entities or other dealers.

5.     Congress sought to bring more price transparency and competition to the derivatives markets, including the IRS market, with the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank" or the "Dodd-Frank Act").  Dodd-Frank mandates, for example, that standard IRS move to exchanges or Swap Execution Facilities, or "SEFs," which were envisioned as exchange-like platforms that would allow trading on an all-to-all limit order book.[2]  The rules stemming from Dodd-Frank were intended to make the swaps market, which was assailed in the financial crisis, safer, more transparent, and more competitive.

6.     Javelin was founded in 2009 by a group of derivative trading and technology professionals to develop the all-to-all limit order book trading platform demanded by buy-side customers.  Javelin spent millions of dollars and invested years of effort to develop and implement its electronic exchange-like platform.

---

[2]  An "all-to-all limit order book" is an electronic trading platform where participants can submit bids and offers, which are then automatically matched in order to facilitate efficient trading.

7.      What Javelin's founders did not realize — as *no one* realized at the time — was that the reason no all-to-all exchange-like trading platforms existed was because the Dealer Defendants, who act as "dealers" or "market makers" in the IRS market, had conspired to boycott entities offering modern forms of electronic trading to buy-side customers, which would allow the buy-side to enjoy more transparent and competitive pricing and faster execution.

8.      The Dealer Defendants conspired for one simple reason:  to continue to enjoy an extraordinary profit center.  By blocking the entry of Javelin and similar trading platforms into the IRS market, the Dealer Defendants force the buy-side to trade with them in an opaque OTC market in which the Dealer Defendants hold all the cards.  By conspiring to undermine Javelin and other IRS exchanges, the Dealer Defendants extract billions of dollars in monopoly rents, year after year.

9.      The Dealer Defendants have historically acted as the market makers (or sell-side) in the OTC market, meaning one of them was typically on one side of every IRS trade with a buy-side customer.  In the OTC market, buy-side customers must request a quote from one or more of the Dealer Defendants.  While investors could obtain quotes from more than one dealer, they could only negotiate a final actionable price typically with one dealer at a time.  This inefficient form of trading does not allow for competitive price shopping through access to real-time price information.

10.      As a result of the lack of price transparency and limited direct price competition, the Dealer Defendants were able to buy IRSs lower and sell them higher than they would have been able to in a competitive market where prices are streamed in real-time on an electronic platform such as Javelin.  Through their collusive control of the IRS market, the Dealer Defendants extracted monopoly rents from the buy-side in the form of inflated bid/ask "spreads."

11.     Absent collusion, the lack of transparency and limited price competition that pervades the IRS market would have disappeared long ago.  Because of the benefits of transparency, competitive pricing, and immediacy, markets for financial products historically move to exchanges or exchange-like trading platforms soon after the products become sufficiently standardized and liquid.  Because of its maturity, size, and high-level of standardization, the IRS market has long been primed for exchange or exchange-like trading.  Faced with a variety of threats of evolution to this modern form of trading, the Dealer Defendants banded together via a horizontal conspiracy, joined by co-conspirators ICAP Capital Markets LLC ("ICAP") and Tradeweb Markets LLC ("Tradeweb"), to protect a highly-profitable market structure that they dominated.

12.     The Dealer Defendants know well the benefits of exchange trading as they trade IRS with *each other* on electronic, exchange-like platforms.  But they have conspired to ensure that *only the dealers* are allowed to trade IRS on these platforms.  Thus, even as they enjoy the benefits of exchange trading among themselves, the Dealer Defendants deny those benefits to their buy-side customers.  Buy-side customers have been effectively "shut out" of this "paradise of infinite liquidity and tight pricing."[3]

13.     Pursuant to their conspiracy, the Dealer Defendants met and agreed to work together to maintain the bifurcated market for trading IRS.  They agreed to squash every potential market entrant that threatened to bring competition and transparency to the IRS market.  As detailed herein, the Dealer Defendants jointly threatened, boycotted, coerced, bought, or

---

[3]  Joe Rennison, *Meet the New OTC Market Makers*, Risk (Feb. 27, 2014), http://www.risk.net/risk-magazine/feature/2331122/meet-the-new-otc-market-makers.

otherwise eliminated any entity or practice that had the potential to bring the benefits of all-to-all exchange trading to the IRS market.

14.     In particular, the Dealer Defendants engaged in a group boycott aimed at shutting down Javelin as well as other exchange-like platforms that would allow the buy-side to trade on an all-to-all limit order book.  These efforts to squash Javelin took several forms, including refusing to deal with Javelin, using the Dealer Defendants' clearing affiliates to refuse clearance of trades between other parties on Javelin, and threatening customers who used Javelin with loss of business or services with the Dealer Defendants or increased fees with the Dealer Defendants.

15.     The Dealer Defendants also police the threat posed by Javelin and other exchange-like platforms through a practice known as "name give-up."   Name give-up requires disclosure of the identity of each swap counterparty to the other on every trade.  The sole purpose of name give-up is to enable the Dealer Defendants to ensure that no buy-side investor trades IRS on the inter-dealer platforms.  Any SEF that does not permit name give-up, such as Javelin, is hung out to dry by the Dealer Defendants' cartel.

16.     The Dealer Defendants were driven to block entry of all-to-all exchange-like platforms, including Javelin, because it was the only way they could protect their control over the lucrative IRS market.  As a result of the Dealer Defendants' collusion, Javelin today effectively facilitates no IRS trading despite years of development and millions of dollars in investment capital.  Absent the Dealer Defendants' group boycott, IRS market participants would trade on Javelin's platform.  As detailed below, the boycott of Javelin and other exchange-like platforms fits a pattern of collusion among the Dealer Defendants and others designed to manipulate various aspects of the financial system, including the market for credit default swaps and interest-rate derivatives.

17.    The Dealer Defendants' collusion is responsible for the irrational persistence of antiquated trading practices that deprive the IRS market of the cost savings and transparency associated with exchange trading.  The only SEFs that have any meaningful buy-side customer trading activity today *effectively require* that platform participants trade directly with a dealer. These SEFs — including Tradeweb's — effectively allow only a Request for Quote ("RFQ") trading method with buy-side customers.  This prevents the market from experiencing the true benefits of exchange trading because RFQ, which requires the buy-side customer to "request a quote" from a dealer, is the functional equivalent of transacting OTC.

18.    To make sure that business remained as usual, the Dealer Defendants have also conspired to ensure that interdealer brokers, or "IDBs," do not open their trading platforms to buy-side customers.  IDBs have long operated IRS trading platforms with exchange-like features. But, under collective pressure from the dealers, they only allow *dealer-to-dealer* transactions.  If an IDB were to allow buy-side customers access to the dealer-only platforms, the bifurcation of the market desired by the Dealer Defendants would have collapsed long ago.  But the Dealer Defendants made sure that any IDB that dared to consider opening its platform to the buy-side was put in the "penalty box" and blackballed.  Defendant ICAP, the leading IDB for IRS, has agreed with the Dealer Defendants to not open its interdealer platforms to the buy-side in exchange for the Dealers' promise of continued liquidity and the primary market share in the interdealer market.

19.    Defendant Tradeweb acts as the primary forum for Defendants' collusion.  In late 2007, the Dealer Defendants began to be concerned about the possibility that Tradeweb, which was then owned by Thomson Reuters, would introduce more competition to the IRS market, in the form of an electronic trading platform.  To respond to this threat from Tradeweb, and other

entities planning similar initiatives to bring competition and transparency to the IRS market, Goldman Sachs championed a "consortium" strategy.  As part of this strategy, Goldman Sachs would work together with the other main dealers in the IRS market (*i.e.*, Goldman's competitors) to neutralize Tradeweb by jointly taking it over and stopping Tradeweb from moving forward with its plans.  Goldman Sachs also saw Tradeweb as a vehicle to coordinate the conduct of the Dealer Defendants going forward.

20.     And that is exactly what the Dealer Defendants did.  As part of a coordinated effort they named "Project Fusion," nearly all of the Dealer Defendants (originally, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS, later joined by Citigroup, Bank of America and then Barclays) jointly took control of Tradeweb. After doing so, they made sure Tradeweb would not convert its platform to an anonymous order book for the trading of IRS.  They also agreed to commit certain liquidity to Tradeweb and to withhold support from other trading platforms that threatened their privileged position in the market.

21.     The Dealer Defendants installed themselves on Tradeweb's Board of Directors and a variety of "committees" that meet to discuss the IRS market, secretly, under the cover of a supposedly legitimate and independent enterprise.  Since at least 2008, key strategic personnel from the Dealer Defendants — many identified by name and position below — have used the auspices of Tradeweb to coordinate their conduct to ensure the IRS market does not develop in ways that threaten their collective dominance.

22.     To be clear, Tradeweb is not just a forum for collusion; it is an active participant and co-conspirator.  Before colluding with the Dealer Defendants, Tradeweb was poised to provide more modern and open trading services to the IRS market.  But Tradeweb agreed with

the Dealer Defendants, against its own economic self-interest, to shutter the possibility of offering competitive IRS trading, and to forego the lucrative brokerage fees that would come from facilitating such transactions.  And Tradeweb has abided by that agreement until the present day.

23.     As a result of the Dealer Defendants' collusion, the IRS market has not developed in the manner that financial markets typically do.  The Dealer Defendants have instead collectively kept it frozen in time for their own selfish purposes.

24.     Yet, because Defendants' conspiracy to maintain a bifurcated market is not expressly prohibited by the Dodd-Frank Act, the Commodity Futures Trading Commission (the "CFTC"), the Dodd Frank Act's primary regulator with respect to the swaps market, is unable to address the anticompetitive harms described herein.  Defendants' conspiracy is, however, prohibited by the Sherman Act, whose crucial role in putting a stop to collusive conduct by competitors Congress carefully and expressly preserved.[4]

## PARTIES

### A.    Plaintiffs

25.     Plaintiff Javelin Capital Markets, LLC is a Delaware limited liability company that is registered to do business in New York.  Javelin Capital Markets' principal place of business is located in New York, New York.

26.     Javelin SEF, LLC is a Delaware limited liability company with its principal place of business located in New York, New York.  Javelin SEF conducts swap execution activities,

---

[4]  *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."); *see also* 156 CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

and has been granted permanent registration as a SEF by the CFTC.  Javelin SEF is a wholly owned subsidiary of Javelin Capital Markets.

  **B.**  **Defendants**

  27.  Whenever reference is made to any act, deed, or transaction of any entity, the allegation means that the corporation engaged in the act, deed, or transaction by or through its subsidiaries, affiliates, officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the entity's business or affairs.

  28.  Defendant Bank of America Corporation ("BAC") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.  Defendant Bank of America, N.A. ("BANA") is a federally chartered national banking association with its principal place of business in Charlotte, North Carolina, and branch locations in New York, New York.  BANA is a wholly owned subsidiary of BAC.  On January 1, 2009, Bank of America acquired Merrill Lynch & Co., Inc.  Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York.  MLPFS is a wholly owned subsidiary of BAC.  In addition, MLPFS is registered as a broker-dealer with the U.S. Securities and Exchange Commission ("SEC"), and as a Futures Commission Merchant ("FCM") with the CFTC.

  29.  As used herein, the term "Bank of America" includes Defendants BAC, BANA, MLPFS, and their subsidiaries and affiliates, including Merrill Lynch & Co. and Merrill Lynch Bank USA, that participated in the IRS market.

  30.  Defendant Barclays PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant

9

Barclays Bank PLC is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England and branch locations in New York, New York.  Defendant Barclays Capital Inc. is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Barclays Group US Inc., which in turn is a wholly owned subsidiary of Barclays Bank PLC.  In addition, Barclays Capital Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

31.     As used herein, the term "Barclays" includes Defendants Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., and their subsidiaries and affiliates that participated in the IRS market.  Barclays Bank PLC maintains a New York branch.

32.     Defendant BNP Paribas, S.A. ("BNPP SA") is a corporation organized and existing under the laws of the France, with its principal place of business in Paris, France and branch locations in the United States, including its New York, New York branch.  Defendant BNP Paribas Securities Corp. ("BNPP Securities") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of BNP Paribas North America, Inc., the ultimate parent of which is BNPP SA.  In addition, BNPP Securities is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

33.     As used herein, the term "BNPP" includes Defendants BNPP SA, BNPP Securities, and their subsidiaries and affiliates that participated in the IRS market.  BNPP transacts business in New York, New York.

34.     Defendant Citigroup, Inc. ("Citigroup") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New

York.  Defendant Citibank N.A. ("Citibank") is a federally chartered national banking association with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup.  Defendant Citigroup Global Markets Inc. is a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Citigroup Financial Products Inc., whose ultimate parent is Citigroup.  In addition, Citigroup Global Markets Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Citigroup Global Markets Limited is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England.

35.     As used herein, the term "Citi" includes Defendants Citigroup, Citibank, Citigroup Global Markets Limited, Citigroup Global Markets Inc., and their subsidiaries and affiliates, including but not limited to Citigroup Energy Inc., that participated in the IRS market.

36.     Defendant Credit Suisse Group AG is a corporation organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland.  Defendant Credit Suisse AG is a bank organized and existing under the laws of Switzerland with its principal place of business in Zurich, Switzerland, and it maintains a New York, New York branch.  Defendant Credit Suisse International is a bank organized and existing under the laws of England and Wales, with its principal place of business in London, England.  Defendant Credit Suisse Securities (USA) LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New York, New York, and is a wholly owned subsidiary of Credit Suisse (USA), Inc., whose ultimate parent is Credit Suisse Group AG.  In addition, Credit Suisse Securities (USA) LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

37.     As used herein, the term "Credit Suisse" includes Defendants Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Credit Suisse Securities (USA) LLC, and their subsidiaries and affiliates that participated in the IRS market.

38.     Defendant Deutsche Bank AG is a corporation organized and existing under the laws of Germany with its principal place of business in Frankfurt, Germany.  Defendant Deutsche Bank Securities Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, whose ultimate parent is Deutsche Bank AG.  In addition, Deutsche Bank Securities Inc. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

39.     As used herein, the term "Deutsche Bank" includes Defendant Deutsche Bank AG, Deutsche Bank Securities Inc., and their subsidiaries and affiliates that participated in the IRS market.  Deutsche Bank maintains a New York branch.

40.     Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs Group") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  Defendant Goldman Sachs & Co. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  In addition, Goldman Sachs & Co. is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Goldman Sachs Bank USA is a New York state-chartered bank, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Goldman Sachs Group.  Defendant Goldman Sachs Financial Markets, L.P. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of

Goldman Sachs Group.  Defendant Goldman Sachs International is a bank organized and

existing under the laws of England and Wales, with its principal place of business in London,

England, and is a wholly owned subsidiary of Goldman Sachs Group.

41.     As used herein, the term "Goldman Sachs" includes Defendants Goldman Sachs

Group, Goldman Sachs & Co., Goldman Sachs Bank USA, Goldman Sachs Financial Markets,

L.P., Goldman Sachs International, and their subsidiaries and affiliates that participated in the

IRS market.

42.     Defendant HSBC Bank PLC is a bank organized and existing under the laws of

England and Wales, with its principal place of business in London, England.  Defendant HSBC

Bank USA, N.A. is a federally chartered national banking association with its principal place of

business in McLean, Virginia, and branch locations in New York, New York.  Defendant HSBC

Securities (USA) Inc. is a corporation organized and existing under the laws of the State of

Delaware, with its principal place of business in New York, New York.  In addition, Defendant

HSBC Securities (USA) Inc. is registered as a broker-dealer with the SEC, and as an FCM with

the CFTC.

43.     As used herein, the term "HSBC" includes Defendants HSBC Bank PLC, HSBC

Bank USA, N.A., HSBC Securities (USA) Inc., and their subsidiaries and affiliates that

participated in the IRS market.

44.     Defendant J.P. Morgan Chase & Co. is a corporation organized and existing under

the laws of the State of Delaware, with its principal place of business in New York, New York.

Defendant J.P. Morgan Chase Bank, N.A. is a federally chartered national banking association

with its principal place of business in New York, New York.  Defendant J.P. Morgan Securities

LLC (also known as "J.P. Morgan Securities Inc.") is a corporation organized and existing under

the laws of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of J.P. Morgan Securities Holdings LLC, which in turn is a subsidiary of JPMorgan Chase & Co.  In addition, J.P. Morgan Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant J.P. Morgan Securities Plc is a corporation organized and existing under the laws of England and Wales, with its principal place of business in London, England, and it is a wholly owned subsidiary of J.P. Morgan Chase & Co.

45.     As used herein, the term "JP Morgan" includes Defendants J.P. Morgan Chase & Co., J.P. Morgan Chase Bank, N.A., J.P. Morgan Securities LLC, J.P. Morgan Securities Plc, and their subsidiaries and affiliates that participated in the IRS market.

46.     Defendant Morgan Stanley ("MS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York. Defendant Morgan Stanley Bank, N.A. is a federally chartered national banking association with its principal place of business in Salt Lake City, Utah, and is a wholly owned subsidiary of Morgan Stanley Delta Holdings LLC, the ultimate parent of which is MS.  Defendant Morgan Stanley & Co. LLC ("MS&C") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS.  In addition, MS&C is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.  Defendant Morgan Stanley Capital Services LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York, and is a wholly owned subsidiary of Morgan Stanley Domestic Holdings, Inc., the ultimate parent of which is MS.  Defendant Morgan Stanley Derivative Products Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of

business in New York, New York, and is a wholly owned subsidiary of MS.  Defendant Morgan

Stanley & Co. International plc is a corporation organized and existing under the laws of

England and Wales, with its principal place of business in London, England, and is a subsidiary

of Morgan Stanley UK Group, the ultimate parent of which is MS.  Defendant Morgan Stanley

Bank International Limited is a bank organized and existing under the laws of England and

Wales, with its principal place of business in London, England, and is a wholly owned subsidiary

of Morgan Stanley International Holdings Inc., the ultimate parent of which is MS.

47.     As used herein, the term "Morgan Stanley" includes Defendants MS; Morgan

Stanley Bank, N.A.; MS&C; Morgan Stanley Capital Services LLC; Morgan Stanley Derivative

Products Inc.; Morgan Stanley & Co. International plc; Morgan Stanley Bank International

Limited, and their subsidiaries and affiliates, including Morgan Stanley Capital Group Inc. and

Morgan Stanley Capital Products LLC, that participated in the IRS market.

48.     Defendant Royal Bank of Scotland PLC ("RBS PLC") is the primary operating

bank of Defendant The Royal Bank of Scotland Group PLC ("RBS Group PLC"), a corporation

organized and existing under the laws of England and Wales with its principal place of business

in Edinburgh, Scotland and regional offices in New York, New York and Stamford, Connecticut.

Defendant RBS Securities Inc. is a corporation organized and existing under the laws of

Delaware, with its principal place of business in Stamford, Connecticut, and is a wholly owned

subsidiary of RBS PLC.  In addition, RBS Securities Inc. is registered as a broker-dealer with the

SEC, and as an FCM with the CFTC.

49.     As used herein, the term "RBS" includes Defendants RBS PLC, RBS Group PLC,

RBS Securities Inc., and their subsidiaries and affiliates that participated in the IRS market.  RBS

PLC maintains a New York branch.

50. Defendant UBS AG ("UBS AG") is a corporation organized and existing under the laws of Switzerland with its principal places of business in Basel and Zurich, Switzerland and regional offices in New York, New York and Stamford, Connecticut.  Defendant UBS Securities LLC is a corporation organized and existing under the laws of Delaware, with its principal place of business in New York, New York, and is an indirect wholly owned subsidiary of UBS AG.  In addition, UBS Securities LLC is registered as a broker-dealer with the SEC, and as an FCM with the CFTC.

51. As used herein, the term "UBS" includes Defendants UBS AG, UBS Securities LLC, and their subsidiaries and affiliates that participated in the IRS market.  UBS maintains a New York branch.

52. Defendant ICAP Capital Markets LLC is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Jersey City, New Jersey.  As used herein, the term "ICAP" includes Defendant ICAP Capital Markets LLC and its subsidiaries and affiliates that acted as brokers for a wide range of asset classes, including IRS, the foreign exchange market, commodities, credit default swaps ("CDS"), and various equities. In the IRS market, ICAP acts as an IDB, brokering IRS trades between dealers.

53. Defendant Tradeweb Markets LLC ("Tradeweb Markets") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.  As used herein, the term "Tradeweb" includes Tradeweb Markets and its subsidiaries and affiliates that provided trading services for IRS, CDS, and other asset classes.  Tradeweb has historically focused on providing electronic trading services in the dealer-to-client side of the market.  Tradeweb is jointly owned by Thomson Reuters and a

16

consortium of Wall Street Dealers (the Dealer Defendants other than BNPP and HSBC).[5]  The

Dealer Defendants exercise control over Tradeweb.

## JURISDICTION AND VENUE

54.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C.

§§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees,

against Defendants for the injuries to Plaintiffs alleged herein, arising from Defendants'

violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

55.     This Court has subject matter jurisdiction over this action pursuant to Sections 4

and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331

and 1337(a).

56.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22, as well as

pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Plaintiffs resided, transacted business,

were found, or had agents in this District; all the Defendants resided, transacted business, were

found, or had agents in this District; a substantial part of the events or omissions giving rise to

these claims occurred in this District; and a substantial portion of the affected interstate trade and

commerce discussed herein was carried out in this District.

57.     Defendants' activities, and those of their co-conspirators, were within the flow of,

were intended to, and had a substantial effect on interstate commerce.

58.     Pursuant to the nationwide contacts test provided for by 15 U.S.C. § 22, many

Defendants are subject to personal jurisdiction in the United States because they, as set forth

below, were formed in or have their principal places of business in the United States.  In

---

[5]  *See* Matthew Leising, *Tradeweb's Bank Owners Said to Consider New Bond-Trading* System, BLOOMBERG (Nov. 23, 2013), http://www.bloomberg.com/news/articles/2013-11-22/tradeweb-s-bank-owners-said-to-consider-new-bond-trading-system.

addition, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, and had the intended effect of, causing injury to Plaintiffs residing in, located in, or doing business throughout the United States.

59.     The Dealer Defendants are also subject to personal jurisdiction here because they each transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.  The IRS at issue in this action — which, indeed, often included a contractual clause submitting the parties to jurisdiction in this District — were regularly traded through desks at the major sell-side banks located in New York.  The Dealer Defendants are also subject to personal jurisdiction here because their affiliates and subsidiaries traded IRS swaps in the United States as their agents, and if these agents did not, the Dealer Defendants would have to have made those trades themselves.

## FACTUAL ALLEGATIONS

## I.     THE MARKET FOR INTEREST RATE SWAPS

### A.     The Trading of Interest Rate Swaps

60.     When the market for IRS began, IRS were not standardized and had to be negotiated and documented on a trade-by-trade basis.  As a result, IRS trading involved high transaction costs.  Nonetheless, because IRS allowed parties to manage and hedge against movements in interest rates, they became widely used by a variety of investors.  Many entities also began to use IRS to speculate about interest-rate movements.

61.     The way in which IRS transactions took place evolved as trading activity increased.  The industry adoption of the ISDA Master Agreement — first created in 1987 — drove the standardization of IRS.  By no later than 2000, all of the material terms of most IRS —

the tenor, the fixed rate, the benchmark rates used to calculate floating payments, and the timing

of payments — were standardized, resulting in lower transaction costs and higher volumes.

62.     Consequently, the IRS market has grown exponentially over the last three

decades.  From 2006 to 2014 alone, the outstanding notional value of IRS grew from $230

trillion to $381 trillion.

63.     As demand for IRS increased, major banks — primarily the Dealer Defendants

here — took on the role of market making or providing liquidity in the IRS market.  As market

makers (also called the "sell-side"), these banks became the sellers of IRS, offering fixed and

floating-rate cash flows to their customers — the so-called "buy-side."

64.     IRS trading typically works as follows:  A buy-side customer asks a dealer for a

quote either:  (1) to pay the floating rate and receive a fixed rate, or (2) to pay the fixed rate and

receive a floating rate.  The rate at which the dealer will pay the fixed rate is known as the "bid,"

and the rate at which it will receive the fixed rate is known as the "offer" or the "ask."  For

instance, a five-year IRS may be quoted by a dealer at a bid of 1.25 and an ask of 1.27, meaning

that the dealer will either make payments based on an annualized rate of 1.25% or receive

payments based on an annualized rate of 1.27%.  The fixed rate is the primary term that is

subject to negotiation when entering into an IRS trade.  A buy-side entity that seeks to pay the

floating and receive the fixed rate will receive the "bid" price quoted by a dealer for the fixed

rate.  A buy-side entity seeking to pay the fixed rate and receive the floating rate will pay the

"ask" or "offer" price quoted by a dealer for the fixed rate.  The floating rate in either case is

typically based on the London Interbank Offered Rate (known as LIBOR).

65.     The Dealer Defendants profit by paying low on fixed rates (*i.e.*, the bid price) and

receiving higher fixed rates (*i.e.*, the ask or offer price).  This difference is known as the "bid/ask

spread" or the "spread."  The wider the spread, the more money the Dealer Defendants make. The mid-point of the spread is generally known as the mid-market price.

66.     Trading between the Dealer Defendants and their customers has historically occurred OTC, meaning that an entity seeking to enter into an IRS had to call up various market-making dealers in hopes of finding a counterparty with which to directly trade.  In the OTC environment, a buy-side customer can realistically only call a limited number of dealers, and because pricing in the market fluctuates a customer has no way to know how long a price offered by a dealer will remain open and executable.

67.     While some companies over the last few years have launched trading platforms that use a RFQ protocol whereby a customer can request quotes from several dealers at once, the quotes provided are not live (or executable), and customers must then, as in archaic OTC trading, contact the dealer over the telephone or via Bloomberg chat to obtain a live price and formalize the swap.  A dealer always maintains the right to "step away" from an RFQ quote it has provided.

68.     Simply put, the IRS market available to buy-side customers is devoid of price transparency or competitive pricing.  The market is also not anonymous, as buy-side customers must always identify themselves before finalizing an OTC or RFQ trade.

69.     In marked contrast, the Dealer Defendants here trade with *each other* in a considerably more competitive and transparent marketplace.  When dealers want to lay off risk on other dealers, they trade on dealer-only platforms provided by inter-dealer brokers ("IDBs"). These platforms are very different than the inefficient trading mechanism to which the Dealer Defendants relegate their buy-side customers.

70.     The dealers' exchange-like platforms for inter-dealer transactions offer immediate execution at or close to the mid-market price.  As many IRS products have been standardized for many years, IDBs use electronic exchange-like platforms known as "order books," "limit order books," or "central limit order books" ("CLOBs"), which automatically match the best bids and offers on an anonymous basis.[6]  Dealers submit their bid and ask prices to an IDB, which then publicizes the best quotes, allowing other dealers to view and execute them.  A dealer can view multiple simultaneous quotes via an IDB platform, thereby giving it access to the best bids and asks in the market.  The dealer can immediately enter into an IRS contract at a quoted price without negotiation, or it can ask the IDB to attempt to negotiate (commonly referred to as "tighten up") a better price.  In return for facilitating dealer-to-dealer trades, an IDB earns a fixed-rate commission, known as a "brokerage fee" on each consummated trade.

71.     On an IDB platform, the dealers' identities are concealed from one another until they agree to enter into a trade.  Because IDB platforms allow dealers to view and choose from numerous bid and offer prices, in sharp contrast to the OTC "retail" side of the market, dealers trade with each other at or close to mid-market prices.

72.     This competitive price transparency in the dealer-to-dealer market further benefits the Dealer Defendants because, at the same time they provide bids and asks to the buy-side, they simultaneously see the true mid-market prices available in the interdealer market.  The Dealer Defendants make large profits by agreeing to IRS with buy-side customers on the inefficient retail market while simultaneously having access to better prices for the same IRS products

---

[6]  Luke Jeffs, *GFI Boss Defends Hedge Funds Access to Platforms*, FINANCIAL NEWS (Oct. 1, 2007) (Mickey Gooch, the founder and Chief Executive of GFI, stated that "[f]or the most liquid, electronic markets, there is little difference between the exchanges and the IDBs.").

through the interdealer market or through negotiations with other buy-side customers in the opaque retail market.

73.     While only dealers have access to limit order book trading, nothing about the IRS market inherently requires that to be the case.  Quite the opposite:  because of the standardization of IRS, increased liquidity, and the availability of clearing, much of the IRS market should have moved years ago to all-to-all trading on exchange-like limit order book platforms.[7]  And there are a number of reasons why the buy-side would welcome order book trading.  "A centralised trading platform can bring together a large set of traders with opposing trading interests, reducing search frictions and raising competition to fill an order."[8]  The introduction of all-to-all order book trading brings pricing transparency to the marketplace, typically resulting in a narrowing of bid/ask spreads.

74.     The buy-side remains locked in an archaic market as a result of Defendants' conspiracy to block access to the trading tools that the sell-side has enjoyed for years.  When insurgent entities, such as Javelin, tried to bring all-to-all exchange trading to the market or open existing IDB exchange-like platforms to the buy-side, the Dealer Defendants have actively preserved the status quo by working together to use their collective market power to prevent such efforts from succeeding.

### B.     The Dodd-Frank Act

75.     In reaction to the fallout from the 2008 financial crisis, Congress passed the Dodd–Frank Wall Street Reform and Consumer Protection Act on July 21, 2010.  Among the

---

[7]  *See* DARRELL DUFFIE, DARK MARKETS 6-7 (2012) ("[S]imple interest rate swaps . . . seem like natural candidates for exchange-based trade but are normally traded over the counter.  At this point, we lack convincing theories that explain why such simple and heavily traded instruments are traded over the counter.").

[8]  *See* BANK FOR INT'L SETTLEMENTS, ELECTRONIC TRADING IN FIXED INCOME MARKETS 23 (2016), http://www.bis.org/publ/mktc07.pdf.

stated purposes of the Dodd-Frank Act was to "promote the financial stability of the United States by improving accountability and transparency in the financial system" and to "protect consumers from abusive financial services practices."[9]

76.     A key goal of the Dodd-Frank Act was "to bring greater pre-trade and post-trade transparency to the swaps market."[10]  As the CFTC noted:  "The OTC swaps market is less transparent than exchange-traded futures and securities markets."[11]  The CFTC also recognized that "transparency lowers costs for investors, consumers, and businesses; lowers the risks of the swaps market to the economy; and enhances market integrity to protect market participants and the public. . . all market participants will benefit from viewing the prices of available bids and offers and from having access to transparent and competitive trading systems or platforms."[12]

77.     As part of Dodd-Frank, Congress created a new type of CFTC-regulated entity, called SEFs, defined as "a trading system or platform in which multiple participants have the ability to execute or trade swaps by accepting bids and offers made by multiple participants in the facility or system."[13]

78.     While the Dodd-Frank Act authorized the CFTC to oversee the swaps market, the Act expressly preserved the operation of the antitrust laws to address collusive conduct such as the Defendants' boycott conspiracy.[14]

---

[9] Dodd-Frank Wall Street Reform and Consumer Protection Act Preamble, PL 111-203, Preamble, 124 Stat 1376, 1376 (2010).

[10] Core Principles and Other Requirements for Swap Execution Facilities, 78 Fed. Reg. 33476, 33477 (June 4, 2013) (to be codified at 17 C.F.R. pt. 37).

[11] *Id.* at 33476.

[12] *Id.* at 33477.

[13] 17 C.F.R. § 1.3.

[14]   *See* 12 U.S.C. § 5303 (2010) ("Nothing in this Act, or any amendment made by this Act, shall be construed to modify, impair, or supersede the operation of any of the antitrust laws, unless otherwise specified."); *see also* 156

## II.   JAVELIN'S CREATION OF AN ALL-TO-ALL EXCHANGE-LIKE INTEREST RATE SWAPS TRADING PLATFORM

79.     By at least 2009, the IRS market was primed and ready for the introduction of all-to-all electronic trading.  Most IRS were standardized, and volume was growing exponentially.  The benefits that central clearing and all-to-all exchange trading could bring to the IRS market were widely recognized by market participants, regulators, and economists.  There was also tremendous demand for modern, electronic trading platforms for IRS.

80.     Javelin was founded in 2009 by derivative trading and technology professionals seeking to pursue the obvious market demand for an all-to-all, anonymous CLOB.  Javelin's founders strongly supported the goals of the Dodd-Frank Act of 2010 to enhance pre-trade transparency, market liquidity, and competition in the swaps market and set forth to be among the first registered SEFs under Dodd-Frank.

81.     In developing its SEF, Javelin created a cutting edge technological platform designed to provide IRS traders the market transparency they long demanded.  Javelin created a state-of-the-art user interface that keeps traders in touch with all of the market action.  Users of Javelin's CLOB can view the size and depth of either the historical market or just the days' market action, and anonymously execute a trade with a click of a mouse.  Javelin's trading platform's screens are highly customizable and any configuration can be saved, thereby empowering market participants to execute, manage, and modify orders efficiently.

82.     Javelin also needed to develop technology to allow customers to use Javelin's trading platform.  Javelin created options to allow market participants to trade electronically on Javelin's SEF either through an application program interface developed by Javelin or via an

---

CONG. REC. E1347-01 (2010), 2010 WL 2788137 (statement of Rep. John Conyers, Jr.) ("The final bill contains a number of provisions to ensure that the antitrust laws remain fully in effect.").

industry standard third party gateway.  Javelin also developed a means for traders to engage in traditional RFQ trading, including an option for anonymous RFQ, but Javelin's CLOB was the firm's primary platform.

83.     The development of Javelin's SEF and technological platform demanded enormous industry knowledge and technological skill, thereby requiring the employment of many technology, operations, and sales experts.  Javelin has also incurred other substantial expenses related to the development and operation of its SEF and technological platform, including office rental space, data center fees, licenses to use software and financial vendor platforms, and legal and compliance advice.

84.     Javelin's CLOB-based trading platform was ready for testing by 2011.  While conducting test trials of its trading platform in December 2011, Javelin became the first platform to execute and clear interest rates swap trades in a nearly instantaneous manner, with an average elapsed time of under 2 seconds.  This near instant execution and clearance of trades was highly enticing to IRS traders long-accustomed to lengthy execution and clearance times for OTC and RFQ transactions.

85.     The key to Javelin's trading platform was its CLOB with an "all-to-all" liquidity pool.  Javelin's trading platform offered all customers price transparency, firm and anonymous pricing, IDB-type pricing for all customers, and compliance with Dodd-Frank swap trading requirements.  In addition, Javelin's platform was clearing agnostic, giving customers a choice of clearing house for their swaps business.

86.     On September 19, 2013, the CFTC granted temporary registration to Javelin as a SEF.  At this point, Javelin's SEF was ready for business and well positioned to meet the large demand by IRS traders for a transparent, anonymous trading platform using a CLOB compliant

with Dodd-Frank.  This was a major step forward for the buy-side customers, granting them access to an exchange-trading platform similar to those used by the Dealer Defendants.  Not surprisingly, many prominent buy-side firms, such as AQR, PIMCO, and Eaton Vance, expressed interest in trading on Javelin's CLOB and, by late 2014, Javelin had signed up (or "onboarded") approximately 80 entities to trade on its platform.

87.     Many participants in the IRS market expected the mandatory trading on SEFs to result in "a real fundamental shift."  As stated by Kevin McPartland, head of market structure research at Greenwich Associates:  "It's going to impact how the clients interact with the banks on a day-to-day basis."[15]

88.     Javelin was poised to earn considerable brokerage fees as the first all-to-all, CLOB-based IRS trading platform.  Javelin would have earned these fees but for the Defendants' conspiracy described below.

## III.   DEFENDANTS CONSPIRED TO BOYCOTT JAVELIN AND OTHER ALL-TO-ALL EXCHANGE-LIKE TRADING PLATFORMS

89.     Faced with the threat that Javelin and other all-to-all exchange-like platforms would upset the market order in which they sat at the top, the Dealer Defendants conspired to prevent exchange-like trading platforms from introducing greater competition and transparency.  None of the Dealer Defendants acting alone could stop such trading platforms from succeeding.  The Dealer Defendants instead worked together to ensure that Javelin and other all-to-all exchange-like platforms would not succeed.

---

[15]  Silla Brush, *CFTC Said Ready to Push Interest-Rate Swaps to Trade Venues*, BLOOMBERG (Jan. 9, 2014), http://www.bloomberg.com/news/articles/2014-01-09/cftc-said-ready-to-push-interest-rate-swaps-to-trading-platforms.

90.     As detailed below in section IV, the Dealer Defendants coordinated their conspiracy through numerous forums, including their joint involvement with Tradeweb, the International Swaps and Derivatives Association ("ISDA"), and the Futures Industry Association ("FIA").  The heads of the Dealer Defendants' IRS trading desks also maintained an ongoing dialogue about their preferred structure of the IRS market.  These "heads of rates" regularly communicated with each other through email, Bloomberg messages, lunches and dinners, industry conferences, and other similar events.  In these discussions, these heads of rates desks discussed their mutual desire to maintain the status quo and prevent electronic trading.

91.     Personnel from the Dealer Defendants' strategic groups, which are organized for the specific purpose of protecting the dealer community from the growth of exchange-like trading, met regularly in informal settings to carry out an ongoing dialogue concerning the Dealer Defendants' views on, and coordinate their respective Dealer Defendants' strategy with respect to market strategy in furtherance of the conspiracy.  They discussed their joint opposition to the exchange-trading of IRS and the fact that exchange trading would result in the compression of bid/ask spreads and lower profits.  During these secret discussions, these bank personnel mapped out strategies for neutralizing the threat posed by all-to-all exchange-like platforms.

92.     The Dealer Defendants did this, principally, by boycotting market entrants like Javelin that dared to try to open up exchange-like trading of IRS to the buy-side.  These efforts have "been relentless — sometimes buried in SEF rulebooks and trading workflow minutia, and other times amounting to outright intimidation."[16]  As a result of these collective steps,

---

[16]  DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES DEALERS CLUB 12 (Feb. 2016), https://www.bettermarkets.com/sites/default/files/Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

Defendants have successfully prevented meaningful change in the market.[17]  As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel explained, there remains "a two-tier market today on the S[EF]s — dealer-to-dealer and dealer-to-client" and "[i]t is not truly an all-to-all market."[18]

93.     The IRS market does not have to operate this way.  Not long ago, before the Defendants' collusion became apparent, market participants forecasted "that 40 to 50 firms could end up competing for swaps execution business."[19]  Today, however, only Javelin and one or two other SEFs offer anything close to anonymous all-to-all trading, and those few are on their last legs.[20]

94.     When Javelin and other exchange-like platforms solicited the participation of the Dealer Defendants, the Dealer Defendants would speak with each other to ensure collective action with respect to the platform.  They used a variety of tools to ensure that these platforms failed so they could keep the buy-side relegated to trading on platforms that are nothing more than the functional equivalent of the OTC marketplace.

95.     As a result of the Dealer Defendants' conspiracy, Javelin and other exchange-like platforms here have done little or no IRS trading.

---

[17]  *See* Matthew Leising, *Swaps Revolution Falling Flat as Brokers Keep Grip on New Market*, BLOOMBERG (Mar. 4, 2014), http://www.bloomberg.com/news/articles/2014-03-05/swaps-revolution-falling-flat-as-brokers-keep-grip-on-new-market ("Two weeks after the regulatory shift related to the Dodd-Frank Act took effect, there's been little change — and little indication that it's coming.  Banks are trading interest-rate swaps exclusively with banks in one area, while buyers and sellers such as money managers are doing business in another.").

[18]  Peter Madigan, *Buy-Side Firms Slam Broker Sefs Over Lack of Anonymity*, RISK (Oct. 24, 2014), http://www.risk.net/risk-magazine/news/2377259/buy-side-firms-slam-broker-sefs-over-lack-of-anonymity.

[19]  Mike Kentz, *SEF Start-ups Face Obstacles*, INT'L FIN. REV. (July 22, 2013), http://www.ifre.com/sef-start-ups-face-obstacles/21099200.article.

[20]  *See id.* (noting that "market participants are beginning to doubt the viability of start-up platforms that were once assumed to be guaranteed a slice of the market").

A.    **The Dealer Defendants Boycotted Javelin**

96.     As described above, Javelin expended immense resources to develop an anonymous all-to-all exchange-like trading platform.  By 2011, Javelin was actively soliciting support for its platform by demonstrating its utility to many buy-side entities and dealers, including Dealer Defendants such as Deutsche Bank, Goldman Sachs, JP Morgan, and RBS. Javelin offered Dealer Defendants, including BNP Paribas, RBS, and HSBC, the opportunity to share in revenue on Javelin's platform in exchange for liquidity commitments to Javelin.  Javelin also offered these dealers an opportunity to share in Javelin's success by receiving a portion of Javelin's brokerage fees if the dealers provided liquidity.

97.     Despite tentative initial support from RBS and a number of second-tier dealers, the Dealer Defendants refused to agree to support Javelin.  For instance, Mark Millindorf, a Vice President at Deutsche Bank, repeatedly informed Javelin that the bank would not provide credit checks to the platform, even after testing and approving Javelin's system and telling Javelin that it had passed Deutsche Bank's checks.  Javelin learned from these communications that Deutsche Bank was holding weekly meetings to discuss its strategy for responding to SEFs like Javelin.

98.     In September 2013, Javelin met with Tony Smith (Vice President, Network Engineering) and other Goldman Sachs executives in a meeting arranged by Cassandra Tok (Head of Futures and OTC Clearing Sales).  At the meeting, the Goldman Sachs executives grilled Javelin on whether its platform had to allow all-to-all trading and fished for the names of buy-side customers signed up for Javelin's platform in order to later head off those customers from trading on the platform.  Mr. Smith was careful not to state outright that Goldman Sachs would not support Javelin, but he demonstrated hostility to Javelin operating as a CLOB trading platform.

99.     Despite these warning signs, Javelin prepared to launch its platform in late 2013. The Dealer Defendants, however, became increasingly concerned as Javelin prepared to go live. They recognized that if Javelin successfully launched an anonymous, all-to-all trading platform for IRS, the platform would attract liquidity, increase price transparency, and therefore imperil their privileged status as market makers in a bifurcated market.  Accordingly, they collectively took steps to sabotage the platform.

100.     This sabotage took several forms, as discussed below, including rationing liquidity away from Javelin, permanently delaying review of Javelin documents, using salespersons to threaten customers who used Javelin with a loss of liquidity in IRS and other products, and using clearing affiliates to pressure or cajole customers away from Javelin under the threat of loss of services or increased clearing fees.  Some Dealer Defendants used clearing affiliates to actively refuse granting of pre-trade credit checks to Javelin.

101.     Javelin arranged a series of mock trading sessions to showcase its all-to-all anonymous trading platform to dealers and buy-side entities.  In advance of the trading sessions, Javelin asked many of the Dealer Defendants' affiliated Futures Commission Merchants ("FCMs") to conduct pre-trade credit checks for their buy-side customers to participate in the sessions.[21]  Many of the Dealer Defendants' FCMs refused to provide pre-trade credit checks or push credit to the platform.  While some of the Dealer Defendants, including JP Morgan and RBS, were willing to test the platform's operability, others, such as Deutsche Bank and Goldman Sachs, flatly refused to conduct pre-trade credit checks for Javelin.

---

[21]   IRS trades clear through clearinghouses, which transact directly with a limited number of counterparties known as "clearing members," typically FCMs.  The Dealer Defendants are generally the only entities that can afford the large amount of capital required of clearing members.  Buy-side customers generally work with an FCM to clear their trades for a fee.  If an FCM refuses to clear a trade for a customer on a particular platform, the customer is effectively prevented from trading on the platform.

102.    Nonetheless, many buy-side firms and certain second-tier dealers were impressed by Javelin's platform.  Based on the strength of its technology, Javelin signed up a number of entities to provide liquidity to the platform, including ING Group, Natixis, RBS, and Scotiabank.  Even with this limited initial liquidity, the immediate price transparency and anonymity resulted in remarkably competitive pricing on the Javelin platform, with bid/ask spreads routinely one-quarter basis point wide, and often as low as one-eighth of a basis point.

103.    On October 18, 2013, Javelin became the first swaps trading platform to submit to the CFTC a list of commonly traded interest rate swaps as made available to trade ("MAT") on Javelin's platform.  Under the Dodd-Frank Act, any type of swap transaction that the CFTC certified as made available to trade on a SEF can no longer be traded through an unregulated swaps platform, but must instead be executed on a registered SEF or other CFTC-regulated platform.[22]

104.    Javelin's MAT submission infuriated the Dealer Defendants who wished to continue to trade swaps on dark, unregulated platforms where the Dealer Defendants hold all the advantages.  The Dealer Defendants, through Morgan Stanley and industry trade groups serving their interests, contested Javelin's MAT submission.  Around this time, at least one Javelin employee was informed by an acquaintance who worked for a Dealer Defendant that he should "look for a new job."

105.    On January 16, 2014, the CFTC certified Javelin's amended MAT submission.  More than three years after Dodd-Frank became law, mandated trading of IRS on SEFs finally

---

[22] When forced to trade on a SEF with buy-side customers because an IRS has been made available to trade, the Dealer Defendants – consistent with their conspiracy – will only use SEFs, like Tradeweb, that effectively require that buy-side customers trade directly with a dealer through the Request for Quote ("RFQ") trading method.

began on February 16, 2014, as a result of Javelin's investment into its SEF and its filing of the first MAT with the CFTC.

106.    From late 2013 to 2015, Javelin met with senior employees at each of the Dealer Defendants on numerous occasions to discuss trading or providing liquidity to the Javelin platform.  Even when the employees at the Dealer Defendants did not outright shut the door on providing liquidity or trading on Javelin, they would continuously cite similar pretexts for refusing to conduct business with Javelin, such as claiming they needed to conduct legal review of Javelin's paperwork but never completing such a review.  Regardless of the excuse, the results were always the same:  none of the Defendant Banks (except RBS for a limited period of time) offered to trade on or provide liquidity to Javelin.

107.    The Dealer Defendants' affiliated FCMs also refused to clear trades on Javelin, effectively preventing buy-side customers from using Javelin's CLOB.  Deutsche Bank's FCM, for instance, explicitly refused to clear trades for Javelin.  Similarly, Goldman Sachs' FCM refused to provide credit checks to Javelin, effectively blocking any of its customers from trading on Javelin.

108.    Some Dealer Defendant FCMs went even further and actively pressured their customers not to trade on Javelin.  For example, buy-side customer Citadel Fixed Income Master Fund executed a series of trades on Javelin between January 7, 2014 and February 26, 2014, but then suddenly stopped trading on Javelin.  Javelin later learned that Citadel's COO had said that Citadel stopped trading on Javelin because he had received calls from representatives of the Dealer Defendants pressing him to do so.

109.    Similarly, in October 2013, NISA Investment Advisors LLC ("NISA"), a large buy-side firm, was eager to trade on Javelin.  When Goldman Sachs, NISA's FCM, learned of

this, a Goldman Sachs employee threatened a NISA employee by informing him that if NISA traded on Javelin, Goldman Sachs would withdraw all clearing services in any trading venue. Ms. Tok of Goldman Sachs later informed Javelin that she and an executive at NISA had talked and jointly decided not to proceed with Javelin.  The NISA executive later informed Javelin that he had been pressured by Goldman Sachs to step away from Javelin.

110.    Subsequently, Javelin employees talked with Mr. Smith of Goldman Sachs, and confronted him with Goldman Sachs' inappropriate refusal to clear trades for Javelin.  Smith stated that if Goldman Sachs were somehow forced to clear trades for Javelin, it would simply set the credit limits for all of its customers who attempted to trade on Javelin at "zero," thereby preventing any of their trades from clearing.  That is, Goldman Sachs' FCM was *willing to forego clearing revenues and damage customer relationships in order to shut Javelin out of the market*.

111.    Other Dealer Defendants, including Morgan Stanley, also refused to approve credit to customers who attempted to trade on Javelin.  JPMorgan, for example, used the pre-trade credit checks requirement to block customers, including Mitsubishi UFJ Financial Group ("Mitsubishi") and Natixis Global Asset Management, from trading on Javelin.

112.    The Dealer Defendants' refusal to provide credit checks to Javelin was not based on reasonable commercial concerns.  For example, Goldman Sachs and Javelin were both connected to Traiana, a third-party pre-trade credit system, and there was no additional risk to Goldman Sachs in providing credit checks for Javelin through Traiana, just as Goldman Sachs did with other trading platforms that did not offer meaningful all-to-all CLOB trading.

113.    Despite these formidable obstacles, Javelin was able to generate some trading volume and had signed up approximately 80 entities to trade on its platform.  However, as a

result of difficulty with FCMs and threats from the Dealer Defendants, few customers were able actually to execute trades on the platform.

114.    Even those customers that did execute trades on Javelin's platform eventually abandoned Javelin's platform due to the Defendants' actions.  Mitsubishi, for example, repeatedly attempted to trade on Javelin, but ultimately ceased all activity.  When asked why they had stopped trading on Javelin, Mitsubishi traders informed Javelin that they had received complaints from JP Morgan, their FCM, for doing so.

115.    In October 2014, buy-side interest in Javelin and other CLOB platforms collapsed as investors learned that CLOB trades were not sure to be anonymous.  Many buy-side firms initially explored CLOB trading through aggregator platforms that streamed CLOB quotes from multiple SEFs, including IDBs and Javelin.  The buy-side found aggregators useful because they provided a consolidated view of the market and access to greater CLOB liquidity.  However, use of aggregators steeply declined when news spread that Compagnie Financière Tradition, SA ("Tradition"), a dealer-friendly IDB, had contacted Mitsubishi to complain about Mitsubishi's use of Tradition's CLOB platform, Trad-X, after an aggregator had routed a Mitsubishi trade to that platform.

116.    Meanwhile, the Dealer Defendants continued pressuring Javelin.  In the fall of 2014, Javelin contemplated submitting a second MAT filing to increase the number of IRS products required to be traded on SEFs like Javelin.  A Javelin executive met with executives from many of the Dealer Defendants to discuss the proposed submission.  The Dealer Defendants all responded coldly.  For instance, the Javelin executive went to meet with executives at Deutsche Bank regarding the new MAT submission.  Upon his arrival at Deutsche Bank for the meeting, the Javelin executive was met by a Deutsche Bank executive on the

sidewalk in front of Deutsche Bank's office building.  The Deutsche Bank executive suggested that they go for a walk instead of having the meeting in his office.  During the walk, the Deutsche Bank executive told the Javelin executive not to go through with the new MAT submission and advised the Javelin executive that he would "never work" on Wall Street again if Javelin went through with the filing.

117.    In or around April 2015, after observing the Dealer Defendants' collective refusal to provide liquidity to the platform, RBS abruptly withdrew its support to provide liquidity to Javelin in order to close ranks with its co-conspirators.

118.    As a result of the Dealer Defendants' boycott, Javelin today effectively has no revenues and facilitates no IRS trading.  Despite years of development and millions of dollars in investment capital, Javelin has executed less than 200 trades since its launch.

119.    The Dealer Defendants' joint opposition to Javelin was coordinated.  For example, Javelin employees had numerous conversations with representatives of the Dealer Defendants in which the representatives proffered nearly identical excuses for their refusal to deal, pointing in particular to a supposed lack of customers on the Javelin platform.

120.    In fact, these excuses were entirely pre-textual, given that the Dealer Defendants had gone to great lengths to ensure that potential customers did not trade on Javelin.  As noted above, Javelin had committed liquidity providers by September 2013, guaranteeing that the Dealer Defendants would have counterparties to trade with, and Javelin's platform frequently featured IRS prices that were competitive with or better than, those of rival platforms like Tradeweb.  The real reason for the Dealer Defendants' collective refusal to deal was their unlawful agreement to boycott any platform that threatens to bring exchange trading of IRS to the buy-side.

### B.  The Dealer Defendants Boycotted Other Exchange-Like Trading Platforms

121.    There are striking similarities between the Dealer Defendants' conduct in jointly boycotting Javelin and their conduct in jointly boycotting other trading platforms seeking to offer all-to-all exchange-like trading platforms, such as TeraExchange and trueEX.

#### 1.    *The Dealer Defendants boycotted TeraExchange*

122.    TeraExchange was formed in 2010 and developed an anonymous all-to-all order book for several asset classes, including IRS.  TeraExchange expended immense effort to develop its platform.  TeraExchange began offering access to its electronic trading platform in 2011 and was, along with other SEFs, "poised to take business from the big banks that have dominated swaps trading."[23]

123.    TeraExchange met with representatives from each of the Dealer Defendants occasions to discuss trading or providing liquidity to the TeraExchange platform.  The Dealer Defendants recognized that TeraExchange's CLOB would enable alternative liquidity providers to directly compete with them for business, and they collectively agreed not to provide liquidity to or trade on TeraExchange.

124.    Recognizing the Dealer Defendants' universal refusal to trade on TeraExchange's all-to-all CLOB platform, TeraExchange turned its focus on attracting non-traditional liquidity providers to make markets on the platform, including buy-side entities and second-tier swap dealers.  TeraExchange thought these entities could provide sufficient initial liquidity for the platform to launch, even without the Dealer Defendants.  TeraExchange believed that once trading on the platform began, other market participants would join the platform to take

---

[23]  Matthew Leising, *A Safer Way to Trade Interest Rate Swaps*, BLOOMBERG (Feb. 27, 2014), http://www.bloomberg.com/bw/articles/2014-02-27/interest-rate-swaps-trading-comes-out-of-the-shadows.

advantage of tighter bid/ask spreads, and ease of execution available on an all-to-all order book. TeraExchange was confident that market participants, seeing the many advantages of trading on its CLOB, would demand that swap dealers trade with them on the platform to achieve the same tight bid/ask spreads.  TeraExchange believed that swap dealers, including the Dealer Defendants, having no legitimate reason to refuse to utilize the platform, would follow, bringing their own liquidity.  Indeed, this is what would have occurred in a competitive market.

125.    TeraExchange met with hundreds of market participants, many of which committed to using the platform.  To undermine the platform, the Dealer Defendants' FCMs simply refused to clear trades executed on TeraExchange for any of their customers, despite clearing trades for those same customers on other SEFs that did not offer a CLOB.  By refusing to clear trades from TeraExchange, the Dealer Defendants effectively kept their customers from trading on the platform.  As this was occurring, representatives from numerous Dealer Defendants informed personnel at TeraExchange that its platform would never succeed.

126.    Observing the barriers that the Dealer Defendants had put into place, support for the platform began to falter and customers began retreating from the platform.

127.    TeraExchange obtained temporary registration as a SEF in September 2013, causing the Dealer Defendants to be more vocal in their opposition.  As a result, many buy-side entities became concerned about meeting with TeraExchange for fear of reprisal from their FCMs.  One buy-side entity, for instance, feared that "JP Morgan knew" it was meeting with TeraExchange.

128.    The Dealer Defendants' collective boycott of TeraExchange starved it of the liquidity it needed to succeed.  Absent the Dealer Defendants' anticompetitive boycott, buy-side firms and other liquidity providers would have traded on TeraExchange's platform.

129.    As an alternate business strategy, TeraExchange offered to process trades matched by certain smaller IDBs through its order book in order to comply with Dodd-Frank. Under Dodd-Frank, certain instruments had to be traded through SEFs.

130.    Several IDBs responded positively to the proposal, recognizing that the use of TeraExchange's platform was necessary to their survival.  Somewhere between six and ten of these IDBs entered into agreements with TeraExchange.

131.    The IDBs, however, had, as a practical matter, to obtain the consent of the dealers using their platforms, including the Dealer Defendants.  In striking parallel, the Dealer Defendants universally refused to give such consent, with many of them describing TeraExchange's program as a "Trojan Horse."

132.    Facing a boycott from the Dealer Defendants and knowing it had no chance of success, TeraExchange has left the swaps market.  TeraExchange announced in 2015 that it was shifting its focus to bitcoin derivatives.[24]

### 2.    *The Dealer Defendants boycotted trueEX*

133.    In 2013, trueEX sought to bring to market a SEF offering an IRS exchange-like trading platform open to both buy- and sell-side entities.  TrueEX was founded by Sunil Hirani, who had previously started and operated a successful electronic trading platform for CDS for an IDB called Creditex.

134.    TrueEX was among the first swaps exchange to be approved by the CFTC.[25]  It offered "trading features, such as anonymous trading, that regulators and traders at funds say will

---

[24]   Charles Levinson, *Startup Challenges Dominance of Big Banks in Derivatives Markets*, REUTERS (Mar. 10, 2015), http://www.reuters.com/article/2015/03/10/markets-derivatives-exchange-insight-gra-idUSL1N0WB2D520150310.

[25]   Glen Fest, *TrueEX Takes Early Lead in Building Rate Swaps Exchange*, AM. BANKER (Apr. 1, 2013), http://www.americanbanker.com/magazine/123_4/Swaps-Sequel-10574731.html.

encourage smaller banks and other players, such as hedge funds, to enter the market as dealers [,which] will help increase competition, reduce prices for customers, and decrease risk in derivatives markets."[26]  TrueEX "took a very old way of executing and brought it into the 21st century," which allows a trader to "execute a portfolio of swaps electronically in a very efficient manner."[27]

135.    With these attractive features and Mr. Hirani's background in electronic CDS trading, TrueEX was ready and able to become a successful all-to-all trading platform for IRS. Hirani publicly stated that the platform had signed up 62 buy-side participants, explaining that "[c]learly the buyside demand is there."[28]

136.    But "[m]any of the top derivatives dealers, including Goldman Sachs, Deutsche Bank, Citigroup, Barclays, Bank of America Corp, and Morgan Stanley, have declined to use trueEX," stonewalling the trading platform.[29]  The Dealer Defendants collectively blocked trueEX from becoming a successful exchange-like trading platform for IRS.

137.    Today, trueEX, like Javelin and TeraExchange, facilitates few trades in the IRS market.[30]  And the vast majority of trades that are conducted through trueEX are conducted only on its RFQ platform, on a name-disclosed basis.[31]  Most of those trades are actually

---

[26]  Levinson, *supra* note 24.

[27]  Aaron Timms, *TrueEx Builds Bridges in the New World of Swaps*, INSTITUTIONAL INVESTOR. (July 21, 2015), http://www.institutionalinvestor.com/article/3472545/asset-management-regulation/trueex-builds-bridges-in-the-new-world-of-swaps.html#.Vk5RPk3ItaQ.

[28]  Levinson, *supra* note 24.

[29]  *Id.*

[30]  Timms, *supra* note 27.

[31]  *See* Ivy Schmerken, *Start-Up SEF Taking the Fight to Incumbents*, TABB FORUM (Feb. 26, 2015), http://tabbforum.com/opinions/start-up-sef-taking-the-fight-to-incumbents?print _preview=true&single=true.

"compression" trades — which merely consolidate multiple offsetting trades into one position — done to reduce the overall number of trades in a firm's portfolio and to simplify its balance sheet. No bid/ask spread is associated with "compression" trades, so trueEX's execution of those trades does not threaten the Dealer Defendants in the marketplace.  In sum, the Dealer Defendants have successfully neutralized trueEX from becoming a competitive threat.

### C.     The Dealer Defendants Collectively Refuse to Clear Trades From Javelin and Other Exchange-Like Trading Platforms

138.    As detailed above, denial of clearing services is a potent weapon the Dealer Defendants have in their arsenal, and they have jointly deployed it against all-to-all anonymous SEFs — including Javelin — with devastating results.

139.    In the OTC market, counterparties face each other directly, meaning they bear the full risk of loss if their counterparty defaults.  For IRS with high notional values and long tenors, the effect of a counterparty default can be severe, amounting to millions of dollars in losses on an individual trade.

140.    Clearing resolves this problem.  For cleared transactions, a clearinghouse acts as an intermediary between counterparties and effectively guarantees their performance, greatly reducing counterparty risk.  In order to ensure their financial soundness, clearinghouses add an additional layer of protection, in that they only transact directly with a limited number of counterparties known as "clearing members," which must contribute large amounts of capital to the clearinghouse's default (or "guaranty") fund.[32]  This ensures that a clearinghouse can in all likelihood withstand the default of one of its members.

---

[32]  For example, CME currently requires clearing members to hold at least $50 million in capital *and* contribute at least $15 million in cash to its guaranty fund in order to clear IRS.  *See* CME GROUP, *Summary of Requirements for CME, CBOT, NYMEX and COMEX Clearing Membership and OTC Derivatives Clearing Membership* (Feb. 2016), http://www.cmegroup.com/company/membership/files/Summary-of-CMEG-Clearing-Membership-Requirements.pdf.

141.     Large banks, such as the Dealer Defendants, are generally the only entities that can afford these large capital requirements, and thus function as critical waypoints (or, in reality, roadblocks) on the path to clearing.  As noted above, the dealer-owned entities that serve as clearing members are known as Futures Commission Merchants, or "FCMs."  FCMs generate revenues by clearing trades on behalf of firms that are not clearing members of a clearinghouse. This relationship should be mutually beneficial — the FCMs earn fees on each trade they submit for clearing, and their buy-side customers gain access to clearing without having to comply with onerous capital requirements.

142.     By way of example, suppose X and Y enter into an IRS contract in which X pays a fixed rate and Y pays a floating rate.  Without central clearing, X and Y would make these payments directly to each other, and each would bear the full risk of loss in the event its counterparty defaulted.

143.     By contrast, with central clearing, X and Y would each "give up" their sides of the trade to their respective FCMs, which would then submit each side of the trade to the clearinghouse.  In the end, X and Y "face" their respective FCMs, which, in turn, face the clearinghouse.  Because both X and Y face the clearinghouse (via their FCMs), neither bears counterparty risk with respect to the other.  If X defaults on its payments on the swap, X's FCM remains under the duty to satisfy X's obligation, and it will continue to make payments to and receive payments from the clearinghouse under the terms of the swap.[33]

---

[33]  Importantly, the payments received and paid on the swap are the same regardless of whether the trade is cleared or not — X pays fixed payments and receives floating payments, while Y pays floating payments and receives fixed payments.

144.     By regulation, the Dealer Defendants' FCMs must operate separately from the Dealer Defendants' trading desks.[34]  FCMs should thus be agnostic as to which trading platforms their customers use, and as to their customers' counterparties.  In fact, an FCM operating in its own interest would, subject to credit limits, want to *maximize* the amount of trades it clears for customers, regardless of where or how the trades were executed.  This is because the only risk that FCMs face is the risk that their buy-side clearing customers default, a risk that is not connected to the platform on which a customer conducts an IRS trade.

145.     Due to Defendants' conspiracy, however, this is not how the IRS market operates.  Instead, the Dealer Defendants collectively agreed that *they would not clear trades conducted on all-to-all anonymous SEFs such as Javelin*.[35]  Such conduct is nearly uniform across the Dealer Defendants and directly contrary to the economic self-interests of their FCM affiliates.  Absent a conspiracy among the Dealer Defendants, each of their FCMs would fear losing rejected clearing customers to the FCM's of other Dealer Defendants.  In reaching this agreement, the Dealer Defendants' FCMs capitulated to the demands of their trading desks — the heads of which are often Tradeweb board members — and management, who are focused on keeping buy-side entities from trading on anonymous all-to-all platforms.

146.     The Dealer Defendants' agreement not to clear trades conducted on all-to-all anonymous SEFs not only deters buy-side firms from trading on these platforms; it prevents IRS

---

[34]  *See* 17 CFR §23.605(d)(1) ("No swap dealer or major swap participant shall directly or indirectly interfere with or attempt to influence the decision of the clearing unit of any affiliated clearing member of a derivatives clearing organization to provide clearing services and activities to a particular customer"); *id.* §23.605(d)(2) ("Each swap dealer and major swap participant shall create and maintain an appropriate informational partition . . . between business trading units of the swap dealer or major swap participant and clearing units of any affiliated clearing member of a derivatives clearing organization to reasonably ensure compliance with the Act and the prohibitions specified in paragraph (d)(1) of this section.")

[35]  *See* Kelleher et al., *supra* note 16, at 12 (noting that dealers "deny[] their clearing customers the credit limits necessary to trade on SEFs that don't acquiesce to the dealers' demands").

trades from ever occurring.  FCMs must confirm that their customers are sufficiently creditworthy to execute and clear any given trade *before* the trade takes place, and will not allow the trade to move forward if a customer fails this "pre-trade credit check."[36]  To prevent customers from trading on an all-to-all anonymous trading platform, the Dealer Defendants' FCMs frequently refuse to conduct pre-trade credit checks for any prospective trade on an anonymous all-to-all SEF like Javelin.  When customers do attempt to trade on an all-to-all anonymous SEF, the trade thus *cannot occur*, because the Dealer Defendants' FCMs will not conduct a pre-trade credit check, stopping the trade before it takes place.

147.    At the same time, the Dealer Defendants routinely clear trades executed on co-conspirator Tradeweb's SEF, and other platforms they do not view as threats to the bifurcated market.  The Dealer Defendants' FCMs thus use their gatekeeping roles to steer business away from all-to-all anonymous SEFs and towards their co-conspirators and other, compliant, RFQ-only platforms as a reward for "playing by their rules."

148.    The Dealer Defendants' ability to block clearing has blocked market entry for all-to-all anonymous SEFs.  Without access to clearing, buy-side firms cannot trade on such platforms and are forced to trade on dealer-friendly SEFs like Tradeweb that retain the basic, inefficient structure of the OTC market.

---

[36]   A pre-trade credit check can occur via either a "ping" or a "push" system.   Under a "ping" system, a SEF will "ping" an FCM on a per-trade basis to confirm if a customer has sufficient credit to conduct that trade.  Under a "push" system, an FCM will pre-authorize a customer to clear trades up to a certain credit limit, a practice commonly referred to as "pushing limits."  As an example, JP Morgan might "push" a limit of $500 million to a SEF for its customer, buy-side customer X, meaning that X could trade and clear up to $500 million of IRS on that SEF without needing to re-obtain approval from JP Morgan before every trade.

### D.   The Dealer Defendants Deter Buy-Side Customers From Trading on Javelin and Other Exchange-Like Trading Platforms

149.   The Dealer Defendants also conspired to block exchange trading of IRS by discouraging their customers from using exchanges or exchange-like trading platforms such as Javelin.  The Dealer Defendants discourage their customers by withholding clearing services to their customers who attempt to trade on anonymous all-to-all exchange-like platforms, insisting on post-trade disclosure practices to discourage exchange-like trading, and even putting their customers in a "penalty box" in an attempt to discourage future transgressions.

150.   These acts, which the Dealer Defendants did in concert, are designed to make exchange trading unattractive to customers and, in some cases, to scare them from attempting to disrupt the OTC market.  "[T]his meaningfully disincentivizes [dealer-to-client] SEFs from making any changes that may receive retaliation from the biggest dealer banks.  As a result, there is little opportunity for 'organic' market evolution to occur in such a deeply anti-competitive marketplace."[37]

1.   *The Dealer Defendants withhold clearing services to buy-side firms that attempt to trade on Javelin and other exchange-like platforms*

151.   The Dealer Defendants conspired to dissuade firms from trading on Javelin and other exchange-like SEFs by threatening them with the complete withdrawal of clearing services or across-the-board increases in clearing fees that make IRS trading cost prohibitive.

152.   Because clearing performs an important risk mitigation function for many IRS, denial of clearing services effectively hamstrings the buy-side's ability to trade IRS.  Therefore, the mere possibility that the Dealer Defendants can, through their FCMs, cut off access to

---

[37]   KELLEHER et al., *supra* note 16, at 12.

clearing is sufficient to deter many buy-side customers from even attempting to trade on exchange-like platforms or push for exchange trading.

153.    The Dealer Defendants' FCMs are able to coordinate their activities because, among other things, their clearing operations communicate regularly with each other.  For example, Piers Murray, the Global Head of Fixed Income Prime Brokerage at Deutsche Bank, used to work as the Global Head of Rates Clearing at JP Morgan.[38]  Mr. Murray regularly communicates with his counterparts at other Dealer Defendants, such as Robert Burke, Co-Head of Bank of America's Global Futures and Derivatives Clearing Services, and Michael Dawley, the head of Goldman Sachs' FCM.

154.    For example, in July 2015, certain of the Dealer Defendants' FCMs, including those of Barclays, BNPP, Credit Suisse, and JP Morgan, began collectively penalizing certain transgressor buy-side firms by hiking their clearing fees "by as much as ten-fold," while obedient buy-side entities "have been protected."[39]  In a competitive market, the Dealer Defendants' FCMs would compete with each other to provide clearing services to their customers.  Instead, the FCMs of Bank of America, Barclays, BNPP, Credit Suisse, JP Morgan, and others collectively threatened to raise or actually raised clearing fees for certain buy-side firms in retaliation for their attempts to trade on Javelin and other all-to-all anonymous SEFs.  Absent collusion, the FCMs would not collectively target the same buy-side firms with higher fees, while keeping fees uniform for other market participants.

---

[38]   Matt Cameron, *Deutsche Snares JP Morgan's Murray for Clearing Role*, Risk (July 2, 2012), http://www.risk.net/risk-magazine/news/2188410/deutsche-snares-jp-morgan-s-murray-clearing-role.

[39]   Peter Madigan, *FCMs Try to "Off-board" Credit and Commodity Funds*, Risk (July 30, 2015), http://www.risk.net/risk-magazine/feature/2419614/fcms-try-to-off-board-credit-and-commodity-funds.

155.    The Dealer Defendants' conduct is strikingly consistent.  For example, an interest rates head at a high-frequency trading firm "noticed … indirect push-back," including that "one dealer … put the brakes on talks to clear for the firm."[40]  The clearing talks "just stalled" after the dealer learned that the buy-side firm "wanted to start acting as a market-maker on Sefs."[41] "A number of other sources at hedge funds and proprietary trading firms" encountered similar "resistance from their dealers."[42]  Several buy-side firms have told "similar stories."[43]

2.    *The Dealer Defendants insist on "name give-up" to deter buy-side participation on exchange-like platforms*

156.    The Dealer Defendants have agreed to insist on "name give-up" in order to discourage buy-side participation on exchange-like trading platforms.  Name give-up refers to the practice of identifying the names of each counterparty to an IRS to the other.  Buy-side firms and independent SEFs have widely decried this practice because, "[i]n practice, in a SEF environment, this unnecessary disclosure of swap counterparties only serves to inform the dealers of the non-dealer firms [or] banks that are attempting to trade on their platforms, and invit[es] retaliation."  Name give-up thus serves as a policing mechanism because it allows the Dealer Defendants to determine which trading platforms abide by the Dealer Defendants' unwritten rules.

157.    For instance, if an order book transaction closes with a dealer on one side, that dealer is able immediately to see if a buy-side participant (a) was allowed access to the order book, and (b) had the audacity to try to capitalize on that access by entering into a transaction

---

[40]  *Id.*

[41]  *Id.*

[42]  *Id.*

[43]  Rennison, *supra* note 3.

over the order book rather than in the OTC (or, more recently, RFQ) systems.  And because the Dealer Defendants are the primary liquidity providers to the market, they are likely to be the counterparties in most trades with buy-side customers, even on an all-to-all trading platform, meaning that they are able to quickly identify any buy-side entity trading on such a platform.

158.    Name give-up should not continue to exist in the IRS market.  Name give-up is a historical artifact, and, because IRS trades conducted on SEFs are now centrally cleared, there is no legitimate justification for maintaining the practice on SEFs.  Neutral commentators, regulators, and even the Dealer Defendants' employees agree as much.

159.    For instance, Declan Graham of UBS admitted as much during a panel discussion at SEFCON on October 26, 2015, noting that name give-up on CLOBs is pointless for cleared swaps.  During a prior SEFCON panel, Rana Chammaa, executive director of FRC Execution Sales at UBS, acknowledged that customers are "sitting on the sidelines because they [IRS exchanges] still maintain post-trade order give-up."[44]

160.    CFTC Chairman Timothy Massad has said he is "very concerned" about name give-up for "trades taking place on a central limit order book that are then immediately cleared," and that he has "not heard a compelling justification" for the practice of name give-up in today's IRS market.[45]  Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel noted, "[i]f you are trading in [an order book] where you are pre-trade anonymous then you

---

[44]  Ivy Schmerken, Swap Markets Debate Anonymous Trading in SEFs, Wall Street & Technology (Jan. 5, 2015), http://www.wallstreetandtech.com/trading-technology/swap-markets-debate-anonymous-trading-in-sefs/d/d-id/1318257.

[45]  Peter Madigan, *Massad:  Sefs Fear Retaliation if They End Name Give-up*, RISK (Apr. 23, 2015), http://www.risk.net/risk-magazine/news/2405534/massad-end-users-shut-out-from-sefs-due-to-post-trade-name-give-up.  The CFTC does not police secret, horizontal collusion between direct competitors in the IRS or any other market.  Moreover, the CFTC Chairman has recently stated that the CFTC has no plans to combat name give-up. *See* FINANCIAL TIMES, *CFTC not planning on anonymity for swaps market* (Oct. 27, 2015), http://www.ft.com/fastft/414101/us-swaps-market.

should also be post-trade anonymous . . . [W]hen you cut through the arguments for post-trade disclosure, it's really just a means to discourage people from participating in the [order book]."[46] And former CFTC Commissioner Mark Wetjen has stated publicly that it is "difficult to rationalize trading protocols that reveal the identities of counterparties on an anonymous, central limit order book."[47]

161.   At the same time, getting rid of name give-up is also very popular with buy-side firms, which have pent-up demand on the buy-side for all-to-all, anonymous trading.[48]  As a result, "[s]ome asset managers have claimed their use of [CLOBs] will increase if they are allowed to trade anonymously."[49]  Richard Mazzella explained that "removing these barriers is important in allowing" a true order book to come to market.[50]  Ken Griffin noted that "anonymous markets foster competition," adding that "[i]t should not matter who provides the best price."[51]  And George Harrington, CFA, Global Head of Fixed Income, Currency, and

---

[46]   Madigan, *supra* note 18.

[47]   *See CFTC Remarks of Commissioner Mark Wetjen before the Cumberland Lodge Financial Services Policy Summit* (Nov. 14, 2014), http://www.cftc.gov/PressRoom/SpeechesTestimony/opawetjen-10.

[48]   *See* Rennison, *supra* note 3 (quoting Sam Priyadarshi, head of fixed income derivatives at Vanguard Asset Management, as stating "[w]e have a deep desire to be able to access these markets"); *id.* (quoting Marc Vesecky, Chief Risk Officer for Tower Research Capital, as stating "Tower is definitely supportive of swap trading moving toward open, efficient electronic trading"); *id.* (quoting the Chief Risk Officer of a large hedge fund as stating:  "I might have an interest in being a liquidity provider.  We already have people on our team who can do that and we are interested in showing bids and offers to the market both for our own portfolio and to take advantage of pricing discrepancies").

[49]   Madigan, *supra* note 45; *see also* Robert Mackenzie Smith, *Bank Swaps Headlock Slips as Chicago Prop Firms Join Sefs*, RISK (Aug. 6, 2015), http://www.risk.net/risk-magazine/feature/2420554/bank-swaps-headlock-slips-as-chicago-prop-firms-join-sefs (quoting the head of fixed income at a principal trading firm as stating:  "If volume moves more towards Clobs, then that's where we'll get more engaged").

[50]   Madigan, *supra* note 18.

[51]   Kris Devasabai, *Citadel's Ken Griffin on Amazon, Bloomberg and Swap Market Reform*, RISK (Oct. 31, 2014), http://www.risk.net/risk-magazine/profile/2377762/citadels-ken-griffin-on-amazon-bloomberg-and-swap-market-reform.

Commodity Execution at Bloomberg LP stated during a panel discussion at SEFCON on October 26, 2015 that there is "a good deal of demand for anonymous trading" for cleared swaps.

162.    Although central clearing eliminated all legitimate reasons for requiring name give-up, the Dealer Defendants recognized its importance in maintaining market bifurcation. Specifically, Brad Levy of Goldman Sachs, Stephen Wolff of Deutsche Bank, and Dexter Senft of Barclays and Morgan Stanley, among others, conspired to keep the practice in place by making their Defendant Dealers' provision of liquidity to a trading platform conditional on the use of the practice.  The remainder of the Dealer Defendants thereafter joined the agreement.

163.    Pursuant to their agreement, the Dealer Defendants collectively boycotted any trading platform, including Javelin, that refused to include name give-up as a feature.  In fact, executives from the Dealer Defendants expressly said they would consider Javelin's CLOB, but only if it included name give-up.

164.    The Dealer Defendants also ensure that name give-up persists through a service known as MarkitWire, which is operated by MarkitSERV.  MarkitSERV is dominated by the Dealer Defendants:  Brad Levy (formerly of Goldman Sachs' PSI group) is currently the CEO of MarkitSERV, and Stephen Wolff (formerly the Head of Interest Rate Trading at Deutsche Bank) is the Head of Group Corporate Strategy at MarkitSERV.

165.    MarkitWire is a trade processing service for IRS and other asset classes offered by MarkitSERV, meaning it delivers trades to clearinghouses once they have been executed by counterparties.  While it is possible to design IRS trading platforms to feature "straight-through processing" — where a trade is immediately sent to a clearinghouse by a SEF once it is executed

— the Dealer Defendants force IDBs to send trades to MarkitWire *before* they are cleared.[52]
MarkitWire then offers the counterparties to an IRS transaction a "last look" at the trade, where
they learn each other's identities and have the option to terminate the transaction.  This process is
inefficient and more cumbersome than exchange trading, and it subjects the parties to
unnecessary post-trade name give-up.[53]  Javelin's platform, for instance, has the capability to
execute trades and send them to the clearinghouse directly while maintaining full anonymity.

166.    The IDBs only use MarkitWire, and disclose the names of the parties to an IRS
transaction post-trade, because the Dealer Defendants collectively insist that they do so.  Buy-
side firms have complained that this practice "is applied to please dealers and that it discourages
non-banks from trading, helping to preserve the traditional market structure in which dealer-to-
client and interdealer markets were separate."[54]

167.    As a result of collective pressure from the Dealer Defendants, numerous SEFs
agreed to impose name give-up on their platforms.  Today, the largest IDB SEFs — BGC,
DealerWeb, GFI, ICAP, IGDL, Tullet Prebon, and Tradition — all maintain name give-up,
thereby effectively preventing buy-side entities from trading on them.[55]  These entities recognize

---

[52]    *See* Peter Madigan, *CFTC to Clamp Down on Delays in Swap Clearing*, Rɪsᴋ (Aug. 5, 2015),
http://www.risk.net/risk-magazine/feature/2420436/cftc-to-clamp-down-on-delays-in-swap-clearing.

[53]    *Id.* (citing a CFTC staffer as stating: "It is not uncommon for it to take more than an hour for counterparties to
agree [to] a trade confirmation on affirmation platforms such as Markitwire").  During a recent SEFCON panel
discussion, Declan Graham of UBS stated that the lack of straight-through processing delays trade processing and
clearing by up to six hours.

[54]    *Id.*

[55]    *See* Rɪsᴋ, *Top of the Swaps* (Nov. 2014), https://www.citadelsecurities.com/_files/uploads/sites/2/2014/12/Ken-
Griffin-Risk-Magazine-Top-Of-The-Swaps-November-2014.pdf (noting that dealer-run platforms feature name
give-up).

the collective power of the Dealer Defendants, and, as an employee of Tradeweb explained, are careful about "not biting the hand that feeds you."[56]

168.     When Tradition launched its IDB CLOB platform, Trad-X, in 2011, it made sure to include name give-up.  As a result, the Dealer Defendants supported the platform, meaning that while they boycotted the anonymous all-to-all SEF order books open to the buy-side, they jointly supported an order book open only to themselves.

169.     The Dealer Defendants even touted the benefits of order book trading of IRS, while neglecting to note that they had conspired to save those benefits for themselves alone.  Christian Mundigo, Global Head of Rates Trading and Co-Head of Americas Fixed Income at BNPP, for instance, stated that "BNP Paribas believes Trad-X will provide the USD swap market with an efficient electronic execution venue for trading interest rate swaps.  We are pleased to support the expansion of this market leading platform across both the Euro and USD markets, where we are committed to be strongly engaged with both the dealer community and our clients."[57]  Elie El Hayek, Managing Director, Global Head of Rates Global Banking and Markets at HSBC stated "HSBC is very pleased to support the launch of Trad-X in USD interest rate swaps.  Trad-X has proved the concept of a hybrid solution with deep liquidity in EUR swaps and we look forward to continue to be a key player in an industry initiative in the US that brings transparency and trade certainty to the market."[58]

---

[56]   Mike Kentz, *New Dawn as Non-bank Enters Interdealer Order Book*, INT'L FIN. REV. (July 18, 2014), http://www.ifre.com/new-dawn-as-non-bank-enters-interdealer-order-book/21154986.article.

[57]   TRADITION, *Trad-X launches USD Interest Rate Swaps*, http://www.trad-x.com/media/2939/trad-x_launches_usd_interest_rate_swaps.pdf (last visited Feb. 25, 2016).

[58]   *Id.*

170.    Ciaran O'Flynn, Managing Director Global Head of Rates eTrading at Morgan Stanley, commented that "Morgan Stanley is committed to supporting execution of swaps trading on electronic venues like Trad-X.  These venues increase the transparency of the swaps market and facilitate the move towards mandatory clearing."[59]  Christopher Murphy, Global Head of Rates & Credit at UBS, added:  "UBS is very pleased to be supporting the launch of Trad-X in USD interest rate swaps. We believe that Trad-X brings a compliant, transparent solution for interest rate swap trading along with deep and firm liquidity. We hope that the launch in USD will build on the success of Euro interest rate swaps."[60]

171.    Name give-up is an effective deterrent to the buy-side's use of all-to-all platforms. As described above, when Mitsubishi UFJ Financial Group traded IRS on Trad-X via an aggregator, its identity was disclosed and it immediately received a phone call from Tradition complaining about Mitsubishi's use of the Trad-X platform.  The IDBs and Dealer Defendants thus work together to ensure that buy-side firms are not trading on IDB platforms.

172.    Name give-up also serves as an effective roadblock to all-to-all trading by forcing the buy-side customer to reveal its trading positions, and thus elements of its trading strategies, to both dealers and other buy-side customers, which may be able to exploit that information against them.  Many buy-side customers go to great lengths to keep their trading strategies confidential.  As Ken Griffin, founder of Citadel Investment Group ("Citadel"), explained, name give-up allows dealers to unfairly "position their book by taking advantage of their trading counterparties' market insights."[61]

---

[59]  *Id.*

[60]  *Id.*

[61]  Devasabai, *supra* note 51.

173.    Michael O'Brien, Director of Global Trading at Eaton Vance, has stated:  "I don't want to show the size of my trades, I don't want people to know how I'm trading.  Information is the most valuable asset we have."[62]  As Richard Mazzella, Chief Operating Officer for Global Fixed Income at Citadel has explained:  "Forcing end-users to disclose themselves if they are in a [CLOB] is a means to discourage alternative market participants from participating in what were historically interdealer [CLOBs.]"[63]

174.    Paul Hamill, formerly employed by UBS and currently the Global Head of Fixed Income, Currencies, and Commodities for Execution Services at Citadel, echoed this sentiment, stating that exchanges without anonymity "can arguably be seen as a disincentive for customers to put liquidity into the platform."[64]  CFTC Chairman Timothy Massad has said that numerous "[i]nvestors have complained that they are unable to break into the inter-dealer markets because they are not anonymous — with names given up after trading."[65]  Indeed, one U.S.-based hedge fund manager stated that "[e]nding name give-up on broker Sefs [would] remove[] the ability for dealers to effect retribution on their clients."[66]

---

[62]   Levinson, *supra* note 24.

[63]   Madigan, *supra* note 18 (O'Brien:  "I would like my desk to be executing any trades possible on central limit order books").

[64]   MARKETS MEDIA, *SEFs Win Qualified Praise* (Oct. 8, 2013), http://marketsmedia.com/sefs-win-qualified-praise/.

[65]   FINANCIAL TIMES, *supra* note 45.

[66]   Rennison, *supra* note 3.

3.      *The Dealer Defendants place transgressors in the "penalty box"*

175.    At the same time the Dealer Defendants collectively prevent all-to-all exchange-like SEFs from succeeding, they themselves use identical platforms.  Tradeweb and a number of IDBs, including ICAP, operate such exchange-like SEFs, but they are open only to dealers.

176.    There is no technical reason why these entities could not allow buy-side entities to trade on their platforms as well, but the Dealer Defendants pressure them not to allow this.  In fact, the Dealer Defendants have "threaten[ed] to withdraw liquidity from any trading platform that admits buy-side firms onto its [order book]."[67]  Such a practice is commonly referred to as being placed in "the penalty box."

177.    The Dealer Defendants pull liquidity from platforms that allow anonymous trading.  For example, when an interdealer SEF "run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform."[68]  In particular, GFI "received heated phone calls from executives at Credit Suisse Group AG and J.P. Morgan Chase" over the introduction of trade anonymity.[69]  The complaining banks, which had planned to use GFI to trade with other banks, "contended that allowing *nonbanks* to trade anonymously could hurt their ability as swaps providers."[70]  In the face of this pressure, GFI promptly reversed course and implemented name give-up.  GFI's story is a well-known example of what happens to brokers that try to implement anonymous trading.

---

[67]  Madigan, *supra* note 45.

[68]  Levinson, *supra* note 24.

[69]  Katy Burne, *CFTC to Propose Swaps Anonymity*, WALL ST. J. (Feb. 16, 2015), http://www.wsj.com/articles/cftc-to-propose-swaps-anonymity-1424132424.

[70]  *Id*. (emphasis added).

178.    As a former IDB employee explained, when the IDB attempted to bring buy-side customers onto its trading platform in a different asset class, the Dealer Defendants discovered this through name give-up and responded with collective threats "to simply move their business to another broker."[71]  He stated that, as a result, the IDB relented, limiting its platform to dealers. The employee added:  "We didn't have much choice but to shut it down."[72]

179.    When asked during a recent panel discussion at SEFCON why the manner in which buy-side firms trade has not evolved in the wake of Dodd-Frank, Scott Fitzpatrick, the CEO of Tradition's SEF, bluntly explained that IDB SEFs were not willing to stand up to dealers and go anonymous because of the risk of a loss of liquidity.

180.    The Dealer Defendants similarly threaten any buy-side investor with being put in the "penalty box" if it attempts to trade on an exchange-like platform, whether it is operated by an IDB or an independent SEF like Javelin.[73]  In such instances, the Dealer Defendants often refuse to trade with the investor in any venue.  Because the Dealer Defendants are the primary market makers in the IRS market, such a boycott effectively prevents the investor from trading IRS as long as it is in the penalty box.  In even more egregious circumstances, the Dealer Defendants collectively threaten a transgressing investor with withdrawal of key banking services and refusal to trade other products.  This intimidation is very effective at maintaining the

---

[71]   Robert Mackenzie Smith, *Interdealer Brokers Need to Change, Say Critics*, Risk (Sept. 14, 2015), http://www.risk.net/risk-magazine/feature/2424954/risk-interdealer-rankings-2015-sector-needs-more-change-say-critics.

[72]   *Id.*

[73]   *See* Rennison, *supra* note 3 (quoting a U.S.-based hedge fund manager as stating:  "In interest rate swaps, we have been given strong signals by our dealers that they would be annoyed if we, as a buy-side firm, showed up in the interdealer platforms.").

status quo, in which every buy-side trade must be executed on an inefficient retail market, ensuring that the Dealer Defendants take a hefty toll on every transaction.

181.    The Dealer Defendants also use the "penalty box" to prevent any non-compliant dealer from breaking ranks, and will refuse to trade with anyone who is suspected of supporting exchange-like trading.

182.    For example, in 2003, Barclays attempted to launch a rudimentary, single-dealer electronic trading platform for IRS called "BARX" by partnering with Bloomberg.[74]  The other Dealer Defendants promptly put Barclays in the "penalty box" and refused to allow Barclays to participate in multi-dealer consortia, such as Tradeweb, for several years.

183.    BARX eventually ended its IRS business and became devoted mainly to foreign exchange ("FX") trading.  Even then, Barclays was only allowed out of the "penalty box" and into the Dealer Defendants' clubhouse in 2008, when Barclays acquired the assets and personnel of the swaps business of Lehman Brothers, including Dexter Senft, who possessed deep connections with the other Dealer Defendants and went on to bring those relationships and that network to Morgan Stanley in 2010.  This acquisition significantly bolstered Barclays' share of the IRS market, and Mr. Senft used his connections to help Barclays ingratiate itself with the other Dealer Defendants, including by taking a stake in Tradeweb.  Senft similarly used his connections to maintain Morgan Stanley's involvement in the conspiracy after he joined in 2010.[75]

---

[74]   *See Bloomberg and Barclays Capital Launch Interest Rate Swaps Trading*, FINEXTRA (July 21, 2003), https://www.finextra.com/news/fullstory.aspx?newsitemid=9515.

[75]   *Barclays Capital Takes Equity Stake in Tradeweb*, TRADEWEB (Sept. 10, 2009), http://www.tradeweb.com/news/news-releases/barclays-capital-takes-equity-stake-in-tradeweb/.

### E.    **The Dealer Defendants' Boycott Has Chilled Market Progress**

184.    The Dealer Defendants' boycotts have sent a message to the industry that *any* SEF platform attempting to offer the buy-side access to an anonymous CLOB platform would be collectively boycotted and crushed, and any buy-side partners would be punished through a denial of trading services and an imposition of excessive clearing fees.

185.    As Angela Patel, Trading Operations Manager at Putnam Investments, a buy-side entity, stated during a recent SEFCON panel discussion:  "No one wants to do anything because no one wants to be the next person to piss everyone off."

186.    SEFs are afraid even to apply to make IRS "available to trade" (and buy-side firms are afraid to trade IRS on exchange-like platforms) because of the risk of collective retaliation by the Dealer Defendants as happened to Javelin.

187.    Stephen Berger, the Director of Government Affairs at Citadel, similarly noted at SEFCON that a "market discipline element . . . is there in the background."  Certain employees of the Dealer Defendants, such as Michael Dawley, Managing Director and Co-Head of Futures and Derivatives Clearing Services at Goldman Sachs, make direct threats to SEFS in order to enforce market discipline.  In 2014, for example, at least one IDB SEF received a threatening phone call from Mr. Dawley after the SEF hired an employee who was perceived as hostile to the Dealer Defendants.

188.    As a result, the Dealer Defendants have effectively deterred any new exchanges or SEFs from entering the market to offer anonymous all-to-all trading to the buy-side.

## IV. DEFENDANTS' OTHER EFFORTS TO BLOCK EXCHANGE-LIKE TRADING OF INTEREST RATE SWAPS

### A. The Dealer Defendants Took Control of Tradeweb to Prevent the Development of a More Competitive Trading Platform

189.    Javelin was not the very first trading platform for IRS.  By early 2008, Tradeweb was poised to introduce exchange trading to the IRS market — a development that the marketplace should have embraced.  Instead, the Dealer Defendants acted in concert to neutralize the threat Tradeweb posed.

190.    A consortium of banks initially founded Tradeweb as a private dealer-backed firm that focused on creating an online marketplace for fixed-income products, such as U.S. Treasuries.  Tradeweb offered a dealer-to-client RFQ platform for IRS that lacked anonymous trading.  Investors could request non-executable and non-binding quotes from multiple dealers.  Tradeweb's success depended on dealers steering trading volume to its platform.

191.    In 2004, Tradeweb was acquired by Thomson Reuters.  Not long after, though, the Dealer Defendants had seller's remorse.  They became concerned that, by selling an electronic trading platform to an independent company, they had relinquished control over an entity that could set up a modern electronic trading platform with trading protocols favorable to the buy-side that could disrupt the established order of the OTC market.  Tradeweb touted itself as a "real-time trading platform" and boasted it was "well positioned to capture new business as the market migrates to more efficient electronic trading platforms."[76]  As a result, the Dealer Defendants resolved to regain control of Tradeweb.

---

[76] *See Thomson to Acquire TradeWeb*, TRADEWEB (Apr. 8, 2004), http://www.tradeweb.com/News/News-Releases/Thomson-to-Acquire-TradeWeb/.

192.     High-ranking executives at the Dealer Defendants hatched the scheme to take back control of Tradeweb.  Goldman Sachs, in particular, championed a "dealer consortium" strategy whereby the Dealer Defendants would take control of Tradeweb to neutralize it as a threat and then use their joint control to provide a forum where the Dealer Defendants could meet to secretly coordinate their conduct under ostensibly legitimate auspices.

193.     This "dealer consortium" strategy was largely devised by Goldman Sachs' Principal Strategic Investments Group ("PSI").  Goldman Sachs uses this strategy to work with its "biggest competitors," *i.e.*, the other Dealer Defendants, to control how markets evolve.[77] The PSI group was a means for Goldman Sachs to "control how the thing turns out."[78]  In fact, the Goldman Sachs PSI group was organized principally for the specific purpose of protecting the "dealer community" from the growth of exchange-like trading.

194.     But Goldman Sachs could not execute the consortium strategy on its own, and the use of the strategy extended to other Dealer Defendants.  JP Morgan has a similar, though smaller, group which worked to implement coordination with its competitions.  Other Dealer Defendants, including Barclays, BNPP, Citigroup, Credit Suisse, and Deutsche Bank, conduct similar strategic activities through their trading businesses.  As discussed in more detail below, personnel in these divisions regularly communicate with their counterparts at other Dealer Defendants to ensure that the dealers act in a coordinated fashion.

195.     In the IRS market, these strategic groups coordinated their conduct under a consortium strategy, code-named "Project Fusion," designed to take back control of Tradeweb.

---

[77]  Liz Moyer, *Goldman Group Takes Stakes in Market Evolution*, MARKETWATCH (Jan. 23, 2012), http://www.marketwatch.com/story/goldman-group-takes-stakes-in-market-evolution-2012-01-23.

[78]  *Id.*

196.    In 2007, liquidity contracts that Tradeweb had with the Dealer Defendants to drive volume to Tradeweb's RFQ platform were expiring.  Tradeweb began to worry that its founding banks would steer liquidity to alternate trading platforms, starving it of necessary trading volume and revenue.  According to one source, "Thomson realized the banks would take their liquidity and shop it around, which would threaten the value of Tradeweb."[79]

197.    As part of "Project Fusion," the Dealer Defendants capitalized on Tradeweb's vulnerability to regain control of the company.  Certain Dealer Defendants — Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS — "agreed to provide liquidity into Tradeweb's markets, including interest-rate swaps."[80]  They also took equity stakes in the company.  In exchange, the Dealer Defendants obtained the right to determine how Tradeweb was governed.  This allowed the Dealer Defendants to ensure that Tradeweb would not convert its platform to one with protocols that would provide more competition and transparency to the buy-side.  HSBC had already been providing liquidity to Tradeweb.[81]

198.    As part of the agreement, the Dealer Defendants that invested in Tradeweb (Bank of America, Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, and UBS) agreed with each other that they would not support other

---

[79]  Ivy Schmerken, *Thomson Plans to Spin Off Tradeweb*, WALL ST. & TECH. (Oct. 10, 2007), http://www.wallstreetandtech.com/trading-technology/breaking-news-thomson-plans-to-spin-off-tradeweb/d/d-id/1258992.

[80]  *Id.*  As explained more fully above, Barclays was initially barred from participating in Tradeweb because the other Dealer Defendants had placed it in the "penalty box" for attempting to launch an IRS electronic trading platform.  Barclays later was allowed to invest in Tradeweb in 2009 (after its penalty had expired).  Bank of America became an investor in 2008, after it acquired Merrill Lynch.  Citigroup also became an investor in 2008.

[81]  *See TradeWeb Goes Live With U.S. Dollar Denominated Interest Rate Swaps Online Trading and STP*, TRADEWEB (Sept. 19, 2005), http://www.tradeweb.com/News/News-Releases/TradeWeb-Goes-Live-With-U-S--Dollar-Denominated-Interest-Rate-Swaps-Online-Trading-and-STP/.

trading platforms that threatened their investment in Tradeweb or that threatened to move the market toward all-to-all exchange trading.

199.    These Dealer Defendants filled Tradeweb's Board of Directors and governance committees with senior personnel so they could control Tradeweb and use it to collude in secret. They selected Lee Olesky, the former Chief Operating Officer for Fixed Income at Credit Suisse, to serve as CEO.  And they installed a chief architect of their consortium strategy, Vic Simone, a Managing Director at Goldman Sachs and the former head of Goldman Sachs' PSI Group, as Chairman of Tradeweb's Board of Directors.[82]

200.    Mr. Simone was succeeded as Chairman by Brad Levy, who also took over as the Global Head of Goldman Sachs' PSI Group.  In other words, the head of the Goldman Sachs division responsible for the consortium strategy designed to work with other dealers to control the infrastructure of the swaps market served as the Chairman of Tradeweb's Board.

201.    The Dealer Defendants packed the remainder of Tradeweb's Board with their personnel, a number of whom were drawn from the Dealer Defendants' groups responsible for coordinating market strategy and structure with other Dealer Defendants.

202.    In addition to Messrs. Simone and Levy, Goldman Sachs personnel on Tradeweb's Board of Directors included Colin Corgan, a partner on the Rates Desk.  Bank of America personnel on Tradeweb's Board of Directors included Shea Wallon, a Managing Director in the Strategic Investments Group, which is the functional equivalent of the PSI and is tasked with addressing market structure changes through coordination with counterparts at other Dealer Defendants.  Other Bank of America personnel on the Tradeweb Board included Luke

---

[82]  *See Tradeweb Appoints New CEO*, TRADEWEB (Sept. 9, 2008), http://www.tradeweb.com/News/News-Releases/Tradeweb-Appoints-New-CEO/; *Citi Takes Equity Stake in Tradeweb*, TRADEWEB (Apr. 8, 2008), http://www.tradeweb.com/News/News-Releases/Citi-Takes-Equity-Stake-in-Tradeweb/.

Halestrap, the Head of Emerging Markets Interest Rates, David Moore, the Head of North America Rates Trading, and Nicholas Brophy, the Head of the Americas Core Rates Trading.

203.    Barclays personnel on Tradeweb's Board of Directors included Dexter Senft, who subsequently headed Morgan Stanley's Fixed Income E-Commerce division; Andrew Challis, the Head of eFICC Distribution and Market Strategic Investments; and Christopher Mosher. Citigroup personnel on Tradeweb's Board of Directors included Sandeep Arora, the Chief Operating Officer, and Nicholas Brophy, the former Head of Rates Trading in the Americas. Credit Suisse personnel on Tradeweb's Board of Directors included Sean Flynn, the Global Head of Investment Banking Strategy, and Timothy Blake, the Head of Interest Rates Trading in the United States.

204.    Deutsche Bank personnel on Tradeweb's Board of Directors included Michele Faissola, the Head of Global Rates, and Stephen Wolff, the Head of Fixed Income e-Commerce and the Head of Interest Rates Trading.  JPMorgan personnel on Tradeweb's Board of Directors included Simon Maisey, Head Global Rates ecommerce & Market Structure, Christopher Paul Wilcox, the Global Head of Rates Trading and the Head of Global Rates Strategic Investments, and Kemal Askar, the Head of Rates Trading in the United States.

205.    Morgan Stanley personnel on Tradeweb's Board of Directors included Dexter Senft, the Global Head of Fixed Income E-Commerce, and David Moore, the Global Head of Structured Interest Rates.  RBS personnel on Tradeweb's Board of Directors included Michelle Neal, the Global Head of Electronic Markets and co-head of FICC Prime Services, and Richard Volpe, the Global Head of Dollar Interest Rates.  UBS personnel on Tradeweb's Board of Directors included Stuart Taylor, the Head Global eBusiness in Fixed Income, Joan Lavis, Global Head of Strategic Investments, and Paolo Croce, Head of European Rates.

206.    The Dealer Defendants used Tradeweb to meet in private and secretly to conspire to control the IRS market.  The aforementioned individuals, and others, met regularly under the cover of Tradeweb's Board and informally, outside of formal Board duties, to coordinate their joint efforts to prevent the buy-side from being able to trade IRS in an all-to-all, limit order book model.

207.    In addition to routine conference calls, which take place as often as every week, the Board meets annually in person in Miami, Florida.  The Dealer Defendants used these meetings to discuss and coordinate their strategy and to further their conspiracy to maintain a bifurcated IRS market.

208.    These personnel also regularly discussed market structure issues outside of the board or committee meetings.  Chris D'Annibale, the Head of Interest Rate Swaps for Tradeweb's interdealer SEF, Dealerweb, regularly hosted dinners at his home in Long Island and at restaurants in New York City that were attended by representatives of the Dealer Defendants. At these dinners, the Dealer Defendants coordinated their strategies for the IRS market.  In such formal and informal communications and meetings, the Dealer Defendants regularly discussed their plans for keeping the market bifurcated and preventing the transition to exchange trading.

209.    The Dealer Defendants also control Tradeweb via its governance committees. Some examples of Tradeweb's governance committees are the "participation committees" that determine who can participate on Tradeweb's SEFs.[83]  Acting through these committees, the Dealer Defendants met and agreed to coordinate their conduct to ensure no threat to their

---

[83]    *See DW SEF LLC: SEF Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/uploadedFiles/ Tradeweb/Content/About_Us/Regulation/DW%20SEF%20Participation%20Committee%20Charter.pdf (last visited Feb. 24, 2016); *TW SEF LLC: SEF Participation Committee Charter*, TRADEWEB, http://www.tradeweb.com/ uploadedFiles/Tradeweb/Content/About_Us/Regulation/TW%20SEF%20Participation%20Committee%20Charter.p df (last visited Feb. 24, 2016).

collective dominance of the OTC market would succeed.  To facilitate the conspiracy, Tradeweb keeps these committees and the identities of their members hidden from the public.

210.    Tradeweb holds itself out as an independent company, pursuing its own objectives in the market.  The Dealer Defendants, however, pressured Tradeweb to agree to take actions against its own individual interest.  For instance, the independent (*i.e.*, non-bank) managers of Tradeweb recognized it would be in Tradeweb's interest to launch an all-to-all anonymous electronic trading platform, and took steps to implement such a platform.  But upon learning of these attempts by Tradeweb's personnel, the Dealer Defendants quickly pressured them to change course.  In turn, the Tradeweb managers agreed with the Dealer Defendants that Tradeweb would not implement pro-competitive changes to its trading platform.

211.    The Dealer Defendants publicly tout Tradeweb as a modern, efficient trading platform that can provide "accurate pricing information" and "greater market transparency."[84] But these "benefits" are a sham, and serve only to placate the buy-side's increasing demands for all-to-all trading.  Pursuant to its agreement with the Dealer Defendants, Tradeweb merely put a new sheen on the OTC market structure — it facilitated *only* dealer-to-client trades on an RFQ platform, rather than through an order book, and did not allow buy-side customers to trade directly with one another.

212.    As a result, the Dealer Defendants use Tradeweb to extract the same supracompetitive profits on dealer-to-client trades that they had historically realized in the OTC market.  Absent a conspiracy, this would be against Tradeweb's independent interest.  Making an efficient, hotly demanded trading platform available to all market participants would increase the

---

[84]   *Nine Global Dealers and Thomson Financial Form Premier Electronic Trading Venture Using TradeWeb*, TRADEWEB (Oct. 11, 2007), http://www.tradeweb.com/MediaCenterTwoColPage.aspx?Pageid=1124&id=1881 &LangType=1033&&LangType=1033&ekfxmen_noscript=1&ekfxmensel=ef6f32368_6_84.

number of trades on Tradeweb and thus increase the fees that it obtained.  Tradeweb's conduct only makes sense as an instrument of the conspiracy.

213.    Today, pursuant to its agreement with the Dealer Defendants, Tradeweb plays an active role in maintaining a two-tiered market structure.  Tradeweb currently operates two different SEFs:  Dealerweb, which is "designed exclusively for dealers" and allows anonymous trading, and Tradeweb SEF, which "is designed for non-dealer market participants and always discloses counterparty identities."[85]  Tradeweb charges approximately $50,000 per month to trade on Dealerweb, but only approximately $100 per month to trade on Tradeweb.  It is "challenging to find a legitimate rationale for this enormous cost differential between these two platforms operated by the same company."[86]  That is because the real reason for this cost structure — which the Dealer Defendants jointly set up — is that it "effectively establishes and entrenches a bifurcated dealer-to-dealer and dealer-to-customer marketplace" in furtherance of Defendants' conspiracy.[87]  In fact, Tradeweb is so committed to denying buy-side access to exchange-like platforms that while Tradeweb SEF technically offers an "order book," this platform is not available to users in any meaningful sense, and those in the industry do  not even view it as an active trading platform.

214.    As Jon Williams, Managing Director and Head of U.S. Institutional Market Operations at Tradeweb, stated during a recent panel discussion at SEFCON in New York City:

---

[85]  DENNIS KELLEHER, CAITLIN KLINE, & VICTORIA DAKA, STOPPING WALL STREET'S DERIVATIVES DEALERS CLUB 12 (Feb. 2016), https://www.bettermarkets.com/sites/default/files/
Better%20Markets%20Policy%20Brief%20-%20Stopping%20Wall%20Street%
E2%80%99s%20Derivatives%20Dealers%20Club.pdf.

[86]  *Id.*

[87]  *Id.* at 12-13.

"we don't have buy-side participants" on Dealerweb.  Again, this results from Tradeweb's

agreement with the Dealer Defendants, and from their agreement with each other.

> **B.**  **The Dealer Defendants Utilize Other Forums to Collude**

215.    While Tradeweb is the principal consortium through which the Dealer Defendants

secretly work together to control the IRS market, the Dealer Defendants coordinate their

conspiracy through other forums as well.

216.    One of these is the International Swaps and Derivatives Association ("ISDA").

ISDA is nominally an industry trade group, but in reality, it served the interests of the Dealer

Defendants.

217.    From 2008 to the present, the Dealer Defendants controlled ISDA's Board of

Directors and used those roles to discuss the IRS market and their conspiracy.  The following

employees of the Dealer Defendants hold positions on the ISDA Board of Directors, and use

ISDA to ensure that they all remain on the same page regarding their collective boycott of all-to-

all electronic platforms for IRS trading:  Stephen O'Connor (Morgan Stanley:  Chairman),

Ciaran O'Flynn (Morgan Stanley:  Director), Keith Bailey (Barclays:  Secretary), Diane Genova

(JP Morgan:  Treasurer), Biswarup Chatterjee (Citigroup:  Director), Kieran Higgins (RBS:

Director), Thibaut de Roux (HSBC:  Director); Elie El Hayek (HSBC:  Director); Christopher

Murphy (UBS:  Director), Will Roberts (Bank of America:  Director), and Eraj Shirvani (Credit

Suisse:  Director).

218.    In addition, the Dealer Defendants meet and collude under the auspices of

meetings of the Board of Directors of the Futures Industry Association ("FIA"), or as part of

various FIA "working groups."  The following employees of the Dealer Defendants currently

hold positions on the Board of Directors of FIA America (FIA's American division):  M. Clark

Hutchison (Deutsche Bank), Emily Portney (JP Morgan), Michael Dawley (head of Goldman

Sachs' FCM), Craig Abruzzo (Morgan Stanley), Malcolm Clark Hutchison (Morgan Stanley),

Jeffrey Jennings (Credit Suisse), Raymond Kahn (Barclays), Jerome Kemp (Citi), Najib

Lamhaouar (HSBC), Edward Pia (UBS), George Simonetti (Merrill Lynch, Pierce, Fenner &

Smith).

219.    ISDA and FIA often coordinate to create "working groups" that provide a forum

for collusion.  One such working group was devoted to the drafting of the "Cleared Derivatives

Execution Agreement" ("CDEA") — a standard form contract intended to govern the

relationship between FCMs and their customers.  The "CDEA Drafting Committee" was chaired

by Maria Chiodi, a Director and In-House Counsel at Credit Suisse.

220.    The CDEA Drafting Committee held numerous meetings throughout 2010 and

2011.  One such meeting was held on April 8, 2011 at the offices of Credit Suisse at 11 Madison

Avenue, New York, NY.  Jamie Cawley, Javelin's former CEO, and Suellen Galish, Javelin's

General Counsel, learned of the meeting in advance, and requested an invitation because they

were concerned that the CDEA Drafting Committee was being used to prevent or limit trading

on all-to-all anonymous trading platforms.  At the meeting, Ms. Galish asked how the CDEA —

which appeared to have been drafted solely for OTC transactions, and did not seem to cover IRS

trades executed on a SEF — would work for trades executed on a SEF.  Athanassios Diplas, then

a Managing Director at Deutsche Bank and Co-Chair of ISDA's Industry Governance

Committee, immediately asked for Ms. Galish's name and who she worked for, and refused to

answer her question.  After the meeting, Ms. Chiodi told Mr. Cawley by email that it was

inappropriate for any representatives of SEFs to attend future CDEA Drafting Committee

meetings.  Thereafter, Javelin was prevented from attending any further Drafting Committee

meetings.  Although the drafting of the CDEAs was purportedly an industry wide process,

exchange-like SEFs including Javelin were shut out of the process, though co-conspirators Tradeweb and ICAP had a voice through their conspiracy with the Dealer Defendants.

221.    The Dealer Defendants also met and conspired through the IDB Tradition.  From 2013 to 2015, Tradition personnel hosted monthly meetings in New York with the collective heads of the Dealer Defendants' IRS trading desks to discuss issues relating to SEFs.  The Dealer Defendants used these meetings to coordinate their positions regarding the IRS market and to ensure that none of them broke ranks from each other to support electronic trading platforms that would threaten the Dealer Defendants' control of the market.

### C.    The Dealer Defendants Prevent Interdealer Brokers From Opening Exchange-Like Platforms to the Entire Market

222.    In addition to taking control of Tradeweb and preventing it from offering more competitive trading, the Dealer Defendants conspired to prevent other market actors from opening exchange-like platforms.  In particular, the Dealer Defendants identified IDBs as a potential platform for facilitating buy-side exchange trading, and moved decisively to quash that threat.

223.    By 2008, a number of IDBs were well-positioned to bring to the entire market all-to-all IRS trading platforms.  Many already operated such platforms in the interdealer market, and opening access to others would not have imposed any additional technological burden. Since IDBs earned brokerage fees on each trade on their platforms, they had strong financial incentives to open their platforms.  Great demand existed for this to happen.

224.    The Dealer Defendants, however, jointly used a carrot and stick approach to prevent IDBs, including ICAP, from opening their platforms.  As a carrot, the Dealer Defendants agreed with ICAP and other IDBs that the dealers would direct IRS transactions between themselves onto IDB platforms and that, in exchange for this dependable revenue stream, the

IDBs would not allow all market participants to trade on their platforms.  As part of this arrangement, the Dealer Defendants committed to the IDBs that they would prevent any customer-facing platforms from expanding into the interdealer space, including into the IRS interdealer market.  At the same time, the Dealer Defendants also threatened the IDBs with collective boycotts if they allowed all market participants access to their platforms.[88]

225.    In 2009, ICAP, the leading IDB in IRS, was poised to break from this arrangement and begin offering IRS exchange trading to the buy-side.  In April 2009, one of ICAP's competitors, Tradeweb (which was at this point owned by the Dealer Defendants), decided to enter the mortgage bond market, offering a trading platform through a division known as Dealerweb.[89]  The result was that ICAP "lost 85 percent of its business over six weeks" in the mortgage bond market after Dealerweb "basically walked away with the market."[90]  Tradeweb's move left ICAP and other IDBs concerned about whether Tradeweb would launch a similar platform in other asset classes, including IRS — a move that clearly would be in Tradeweb's self-interest.

226.    In retaliation for capturing the mortgage bond market, ICAP threatened the Dealer Defendants with an all-to-all exchange for IRS.  ICAP was already developing an electronic-trading platform for the European IDB IRS market called i-Swap that it could have launched as an all-to-all fully anonymous IRS trading platform in the United States and that could have

---

[88]  *See, e.g.*, Levinson, *supra* note 24 (noting that when "a swaps exchange run by GFI Group said it would allow anonymous trading, several banks threatened to pull their business off the platform").  GFI's platform was targeted at the CDS market, but industry sources have confirmed that similar behavior has occurred in the IRS market.

[89]  *See* Bryce Elder & Neil Hume, *Icap Hurt by Banks' Platform*, FINANCIAL TIMES (Apr. 21, 2009), http://www.ft.com/intl/cms/s/0/a4bf29a2-2ead-11de-b7d3-00144feabdc0.html#axzz 419KBvtLz.

[90]  Matthew Leising & Jody Shenn, *ICAP Loses 85% of Mortgage Bond Trading to Dealerweb*, BLOOMBERG (Apr. 21, 2009).

included the buy-side.[91]  This threatened to collapse the bifurcated IRS market the Dealer
Defendants were working together to maintain.

227.    But ICAP never launched the platform.  To avoid damaging each other's business,
ICAP and the Dealer Defendants, through Tradeweb, agreed to a *détente* whereby the Dealer
Defendants would not further expand (through Dealerweb) into the IDB space in exchange for
ICAP not expanding into the dealer-to-client space by establishing an all-to-all anonymous IRS
trading platform.  In addition to their economic leverage over ICAP, the Dealer Defendants were
able to broker and maintain this agreement because they maintain close relationships with
ICAP's CEO, Michael Spencer.

228.    Despite it being in Tradeweb's economic self-interest to repeat its rapid success in
the mortgage bond interdealer market in other markets, Dealerweb did not expand into IRS or
any other market, pursuant to its agreement with the Dealer Defendants, though Dealerweb
maintains the capabilities to execute IRS trades as a threat to non-compliant IDBs.  Similarly,
pursuant to its agreement with the Dealer Defendants, and against its own economic self-interest,
ICAP limited to dealers the ICAP's i-Swap platform.[92]

229.    In February 2013, ICAP expanded i-Swap to the United States, but again limited
participation to the dealers.[93]  Although ICAP publicly promoted that its platforms were open to

---

[91]  *See* Michael McKenzie, *Rate Swap Traders Wait For No Man*, FINANCIAL TIMES (Oct. 19, 2010),
http://www.ft.com/cms/s/0/9c6cf29c-dba5-11df-a1df-00144feabdc0.html #axzz3p2lJ0933 (noting that i-Swap's
European launch laid "the ground for an eventual assault on the US market").

[92]  *See i-Swap*, ICAP, http://www.icap.com/what-we-do/electronic/i-swap.aspx (last visited Feb. 24, 2016) (noting
that upon launch, i-Swap was not open to buy-side participants, that i-Swap "has a number of features that are
specifically developed to reflect the trading strategies of the banks" and that, even today, i-Swap is not directly open
to the buy-side).

[93]  *See ICAP Launches i-Swap in the US*, ICAP (Feb. 19, 2013), http://www.icap.com/what-we-do/electronic/i-
swap.aspx.

all entities in order to comply with certain provisions of Dodd-Frank, its brokers in actuality prevented non-dealer access to i-Swap by refusing to accept bids or offers from non-dealer entities for voice-brokered trades or for inclusion on the order book platform.  ICAP refused such access as a result of an agreement with the Dealer Defendants.

230.    In return, the Dealer Defendants supported i-Swap by directing their business to it, a strategy designed to keep ICAP happy by prolonging its status as the lead IRS IDB and ensure that it saw no need to open up the platform to the buy-side.  Certain of the Dealer Defendants also entered into written agreements covenanting they would not support other electronic IDB platforms, and would inform each other if they were approached by such a platform.

231.    ICAP's restriction on the use of i-Swap was the result of the agreement between ICAP and the Dealer Defendants to maintain the bifurcation of the market for IRS.  Absent Defendants' conspiracy, it would have been in ICAP's interest to launch i-Swap as an all-to-all anonymous trading platform where all the market participants could trade directly with each other without going through a dealer.

232.    ICAP also acted as a key coordinator of the Defendants' conspiracy through regular meetings with senior employees of the Dealer Defendants.  For example, a senior ICAP executive regularly met and golfed with the head of Goldman Sachs' IRS business until November 2013, when the senior ICAP executive changed positions at ICAP.  During these meetings, the senior ICAP executive and the head of Goldman Sachs' IRS business coordinated their positions regarding ISDAfix, a key benchmark interest rate for a range of financial derivative instruments, and maintaining the status quo in the IRS market.  During this time, the

71

senior ICAP executive also met monthly with executives from the other Dealer Defendants to coordinate their positions regarding ISDAfix and maintaining the status quo in the IRS market.

233.    In exchange for ICAP's agreement to block exchange trading, the Dealer Defendants continue to direct liquidity only to SEF operators, such as co-conspirators ICAP and Tradeweb, that play by the agreed-upon rules of the market.  Trading platforms that comply with the rules of the conspiracy receive the vast majority of the trading volume of the Dealer Defendants, resulting in high revenues.

234.    Industry data demonstrates the market bifurcation resulting from Defendants' conspiracy.[94]  Clarus reports daily trading volume for each SEF, and each SEF is categorized as either a "D2C" (Dealer-to-Client) or "D2D" (Dealer-to-Dealer) SEF.

235.    As shown in the figure below, approximately 98% of what Clarus considers Dealer-to-Client trading volume occurs on Tradeweb and Bloomberg.  Trading on these two platforms occurs exclusively through the RFQ protocol with post-trade "name give-up."  These trading features are at the core of the conspiracy, and any buy-side-facing SEF that breaks these rules is left de minimis (or no) trading volume.

---

[94]   The data below comes from Clarus SEFView, *Data for 02/16/2016 – 02/22/2016*.



236.    The D2D side of the market is made up of SEFs that have agreed to play by the

rules of the conspiracy.  *None* of the D2D SEFs shown below allow buy-side customers to trade

on their platforms.



237.    Notably, the Dealer Defendants have maintained the market share of Dealerweb,

the inter-dealer SEF owned and operated by Tradeweb, at a mere 2%.  This reflects the fact that

the Dealer Defendants are — *jointly* — rewarding the IDBs for complying with their demands that IDB platforms remain off-limits to non-dealers.  At the same time, the Dealer Defendants — *jointly* — maintain Dealerweb as a nascent threat to those IDBs, by providing it with minimal liquidity.  The IDBs know that, at any time, the Dealer Defendants could, in lockstep, move their liquidity to Dealerweb, as they had done before, for example, in the mortgage-bond market, when the Dealer Defendants abruptly shifted 85% of trading volume to Dealerweb, "walking away with the market."[95]

### D. The Dealer Defendants Prevent Clearinghouses from Bringing Exchange-Like Trading to the Market

238.    Defendants' collusion thus squashed the most imminent threat to their IRS trading profits — exchange or exchange-like trading.  Yet, the Dealer Defendants were not satisfied. They also coordinated on their preferred IRS clearinghouse and boycotted any clearinghouse that might open the door to exchange trading.

239.    Because a clearinghouse could easily evolve into an exchange or a SEF, and thereby threaten disintermediation and profit loss, the Dealer Defendants collectively gained control over, or boycotted and disciplined, any clearinghouse they saw as a threat to their bifurcation of the IRS market.  As a JP Morgan report stated, "the main concern for the Investment Banking industry is that ***clearing is the first step leading to exchange***/SEF trading for OTC products."[96]  The Dealer Defendants perceived clearinghouses "as representing the thin end of a wedge that would end with contracts being put on exchanges for trading."[97]

---

[95]   Leising & Shenn, *supra* note 90.

[96]   J.P. Morgan Cazenove (Kian Abouhossein and Delphine Lee), *Global Investment Banks:  Investment Banking Wallet Outlook — All Eyes on Equity Derivatives*, GLOBAL EQUITY RESEARCH (Sept. 8, 2010) (emphasis added).

[97]   PETER NORMAN, THE RISK CONTROLLERS: CENTRAL COUNTERPARTY CLEARING IN GLOBALISED FINANCIAL MARKETS 302 (2011).

240.     On July 24, 2006, CME acquired Swapstream, a London based multilateral electronic trading platform for IRS.  At that time, Swapstream supported electronic trading of Euro and Swiss Franc denominated medium- and long-term IRS contracts.  CME publicly announced that "the first order of business . . . is to broaden the product base.  The CME plans to roll out dollar denominated swaps on Swapstream by the first quarter of 2007 and eventually follow with swaps on additional currencies," meaning that it planned to enter the U.S. market.[98]

241.     In July 2007, CME announced its plans to offer the market a cleared IRS product, including IRS denominated in U.S. dollars, through Swapstream starting in the first quarter of 2008.

242.     CME is a threat to the Dealer Defendants because, as an established exchange, it had the potential to offer integrated exchange trading and central clearing of IRS.  In fact, CME stated in July 2007 that "CME Swaps on Swapstream combines unparalleled direct, anonymous access to high-volume customer groups through Swapstream's platforms, with the regulatory protection and risk management previously only available with exchange-traded products."[99]

243.     The threat to the Dealer Defendants was compounded on February 4, 2008, when CME announced that thirty three buy-side participants had committed to an Early Adopter Program for CME Swaps on Swapstream.[100]  The new participants included banks, mortgage banks, asset managers, hedge funds, and proprietary trading firms.

---

[98]   Daniel P. Collins, *CME Acquires Swapstream*, FUTURES MAGAZINE (July 24, 2006), http://www.futuresmag.com/2006/07/24/cme-aquires-swapstream.

[99]   *CME Swaps on Swapstream to be the First Centrally Cleared Interest Rate Swaps Available to All OTC Market Participants*, CME GROUP (July 17, 2007), http://investor.cmegroup.com/investor-relations/releasedetail.cfm? ReleaseID=254515.

[100]   *Swapstream Announces 33 Participants for CME Swaps on Swapstream, the First Centrally Cleared Interest Rate Swap*, PR NEWSWIRE (Feb. 4, 2008), http://www.prnewswire.com/news-releases/swapstream-announces-33-participants-for-cme-swaps-on-swapstream-the-first-centrally-cleared-interest-rate-swap-56784472.html.

244.    The Dealer Defendants, as part of their conspiracy to extinguish any threats from clearinghouses, collectively boycotted Swapstream.  They instead jointly committed to clear IRS transactions only through the clearinghouse they knew they could control — LCH.Clearnet. They also used their market power and influence to prevent other sell-side banks and IDBs from dealing with Swapstream.[101]  Because, unbeknownst to Plaintiff, the Dealer Defendants jointly agreed to refuse to deal with Swapstream, the platform never launched.[102]

245.    As a result of the Dealer Defendants' concerted action and agreements to refuse to deal with Swapstream and the other conduct alleged herein, the Dealer Defendants again blocked the emergence of electronic CLOB trading of IRS.

## V.    ABSENT A CONSPIRACY, IRS MARKET PARTICIPANTS WOULD PREDOMINANTLY TRADE ON JAVELIN AND OTHER EXCHANGE-LIKE TRADING PLATFORMS

### A.    Relevant Market

246.    The relevant market is the market for IRS in the United States.  IRS are, and are widely perceived by those in the industry to be, a unique financial product.  The market for the purchase and sale of IRS in the United States is treated as a distinct financial market by market participants, government actors, and in economic literature.

247.    Other derivative products are not substitutable for IRS.  The rapid rise in IRS volume following their inception in the mid-1980s demonstrates that investors turned to IRS to secure the unique and critical function of protection against future movements in interest rates.

---

[101]   E. Paul Rowady, Jr., *OTC Interest Rate Swaps and Beyond:  The Path to Electronic Markets*, DERIVALERT (Jan. 2010).

[102]   *Id.*

### B.     The Dealer Defendants Have Substantial Market Power

248.    Currently, the Dealer Defendants continue to account for most IRS dealing, and they continue to earn extraordinary profits from their OTC-like trading.

249.    Each Dealer Defendant possesses a significant share of the IRS market, and they collectively dominate the market.  Based on available market-share information, the Dealer Defendants collectively control at least 70% of the market.  Indeed, in 2014, five of the ten Dealer Defendants collectively controlled over 50% of the IRS market by themselves while the remaining five Dealer Defendants controlled at least an additional 20% of the IRS market.[103]

250.    The Dealer Defendants' market power is well-recognized.  As Paul Rowady of the TABB Group stated:  "Given the indispensable role of dealers in the OTC derivatives market, it is clear that few structural changes can occur without dealer support."[104]  Mr. Rowady also stated that "[f]rankly, nothing happens in OTC derivatives without the major dealers blessing the moves, as they are counterparty to every trade."[105]

251.    The Dealer Defendants, however, dominate more broadly defined geographic markets as well, including the global market.

---

[103]   In 2014, Bank of America was reported to control 12.6% of the IRS market, JP Morgan was reported to control 11.4% of the IRS market, Deutsche Bank was reported to control 9.5% of the IRS market, Citigroup was reported to control 9.2% of the IRS market, and Barclays was reported to control 8.2% of the IRS market.  In 2012 Goldman Sachs was reported to control 6.9% of the IRS market, HSBC was reported to control 5.0% of the IRS market, BNPP was reported to control 4.9% of the IRS market, and Morgan Stanley was reported to control 3.2% of the IRS market.  The remaining Dealer Defendants — Credit Suisse, RBS, and UBS — collectively controlled over 10% of the IRS market in 2012.  *See* GREENWICH ASSOCS., 2013 GLOBAL INTEREST RATE DERIVATIVES:  DEALER RANKINGS & MARKET TRENDS REPORT — UNITED STATES 1 (2013).

[104]   Michael Mackenzie & Gillian Tett, *Markets:  Frozen in Time*, FINANCIAL TIMES (June 15, 2010), http://www.ft.com/intl/cms/s/0/bf3fd548-78b6-11df-a312-00144feabdc0.html#axzz 3sFYwvyw0.

[105]   *Id.*

## C.   Defendants' Conspiracy Robbed Javelin of Substantial Profits

252.    As a result of the Dealer Defendants' joint boycott of Javelin and other anonymous all-to-all trading platforms, the SEFs that have succeeded are either controlled by the Dealer Defendants (Tradeweb), have explicitly entered into an unlawful agreement not to compete with the Dealer Defendants and breach the artificial market division (ICAP), or have recognized that the only way to avoid retaliation from the Dealer Defendants is to focus on providing an RFQ platform (Bloomberg).[106]

253.    Javelin and other SEFs that attempted to abolish name give-up have seen their customers threatened and their businesses hobbled by coordinated refusals to deal.[107]  As described above, due to the Dealer Defendants' conspiracy *not a single SEF offering all-to-all anonymous trading currently does any meaningful business in the IRS market*.

254.    But for Defendants' anticompetitive acts, the IRS market would have gravitated to Javelin and other exchange-like platforms, thereby generating immense profits for those all-to-all SEFs that, like Javelin, stood ready, willing, and able to onboard customers and execute transactions.

255.    In sum, if Javelin had not been jointly boycotted by the Dealer Defendants there would have been a rapid migration of IRS onto Javelin.

---

[106]   While Bloomberg nominally offers a "CLOB," this platform sees little activity in IRS because the Dealer Defendants refuse to trade on it and buy-side firms fear that they will face retaliation from the Dealer Defendants if they do so.

[107]   *See also, e.g.,* Karen Brettell, *Banks' Pressure Stalls Opening of U.S. Derivatives Trading Platform*, REUTERS (Aug. 27, 2014), http://www.reuters.com/article/2014/08/27/us-usa-derivatives-banks-idUSKBN0GR1Z320140827.

**D.**     **Absent Collective Action, It Would Have Been Economically Rational for Individual Defendants to Support Structural Changes**

256.    Absent a conspiracy to punish them for doing so, investors would have supported, and flocked to, all-to-all platforms like Javelin that promised to keep their anonymity while also compressing bid/ask spreads due to increased competition and transparency.

257.    Absent a conspiracy, it would have been in the individual interest of many different market participants — including IDBs, clearinghouses, and SEFs — to offer an all-to-all trading platform solutions to the buy-side.  Instead, because of Defendants' conspiracy, Javelin and other SEFs that *have* tried to offer such platforms have been put out of business, while SEFs like Tradeweb that replicate the structure of the OTC market have remained successful.  Without the Defendants' collusion, offerings such as those by Javelin would have generated large new revenue streams through increased volume and market share.

258.    Absent a conspiracy, it also would have been in the individual interest of many Dealer Defendants to support such a change as well.  Absent a conspiracy, evolution to an exchange or any type of order book would have been inevitable — it is the natural progression when financial products become, as most IRS have long been, highly standardized, high-volume products.  This is particularly true where, as here, Javelin and other solution providers were actively entering the market to make this happen in response to strong demand.  Each Dealer Defendant, absent coordination, should have been looking out for its own self-interest — which would have been furthered by partnering with Javelin or some other exchange-like platform in order to "get in on the ground floor," increasing its own market share and positioning itself for a fully competitive IRS market.

259.    Absent a conspiracy, an individual Dealer Defendant could increase its own market share by providing a more favorable trading experience to customers in the form of fully

anonymous order-book trading. Even leaving aside the potential to be an industry leader and gain first-mover advantage, each Dealer Defendant would have an independent interest in trading on the new platforms and providing clearing services, all of which could have been a profitable source of income. Because no individual Dealer Defendant could prevent exchanges from flourishing, the only way to overcome each Dealer Defendant's individual economic self-interest in participation was to coordinate a united front that could prevent the emergence of exchanges.

260.    An exchange-like platform has not emerged. Not because IRS are not ready for all-to-all trading. Not because the buy-side does not want all-to-all trading. Not because Javelin and other solution providers were not ready, willing, and able to offer all-to-all trading. Instead, we have this world because the Dealer Defendants collectively blocked the market's evolution. Only a conspiracy that assured each Dealer Defendant that all-to-all trading was not going to happen explains why no Dealer Defendant seized on the opportunity to profit by being the one in the lead when the inevitable change came, and why no other solution provider has stepped into the resulting void.

261.    Defendants' agreement was a per se illegal agreement among horizontal competitors to collectively boycott Javelin and thwart competition. The Dealer Defendants' collective refusals to deal with Javelin and other exchange-like platforms that would not play ball comprised a group boycott that is per se illegal under the antitrust laws.

### E.    Investigations and Litigation Concerning the Credit Default Swaps Market and ISDAfix Show a Pattern of Collusion Among the Dealer Defendants to Manipulate Various Aspects of the Financial System

262.    This is not the first time the Dealer Defendants abused their collective influence over the market's infrastructure to obtain extraordinary profits with respect to a derivatives product. To the contrary, the Dealer Defendants' strategy here parallels their alleged misbehavior in the CDS market and in their manipulation of ISDAfix.

1.       *The Dealer Defendants' Misconduct in the Credit Default Swaps Market*

263.     The Dealer Defendants' misconduct in the CDS market has been the subject of two separate investigations by the United States Department of Justice ("DOJ") and the European Commission ("EC").  The DOJ and EC investigations were spurred by complaints by market participants that the Dealer Defendants, who were the major CDS dealers, were abusing their control of the market to limit price transparency and competition.[108]  In one widely reported email, for example, Samuel Cole, then-Chief Operating Officer of buy-side firm BlueMountain, lamented that banks, including many of the Dealer Defendants, were engaging in "liberal use of dissembling and obfuscation" in order to retain their "oligopolistic dominance" of most major market structures in the credit markets.[109]

264.     The concerns expressed by the DOJ and EC are similar to present-day complaints about anticompetitive behavior in the IRS market.  For example, the EC stated that "the banks acted collectively to shut out exchanges from the market because they feared that exchange trading would have reduced their revenues from acting as intermediaries in the OTC market."[110]  The EC believed that "the investment banks also sought to shut out exchanges . . . by coordinating the choice of their preferred clearing house."[111]

---

[108]   *See* Liz Rappaport, Carrick Mollenkamp & Serena Ng, *U.S. Tightens Its Derivatives Vise*, WALL ST. J. (July 15, 2009), http://www.wsj.com/articles/SB124756743503138067.

[109]   Serena Ng, *Friction on Swaps Response*, WALL ST. J. (June 3, 2009), http://online.wsj.com/news/articles/SB124390301244674747.

[110]   European Commission, *Press Release — Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

[111]   *Id.*

265.    The striking similarities also carry over to the means by which exchange-like trading was blocked — *i.e.*, collective control over the system's infrastructure, by way of group boycotts.  For instance, CME backed a joint venture (with Citadel) known as CMDX, which was going to enable market participations to execute CDS trades through a CLOB.

266.    In June 2008, CMDX was presented to the market.  Members of the sell-side were offered equity in the venture, creating significant upside for those who would move first to support the migration to an exchange.

267.    CMDX was operationally ready by the fall of 2008[112] and was initially backed by several dealers.[113]  CMDX ran into a brick wall, however, once the CDS dealers, including the Dealer Defendants, were able to circle the wagons.  Further, as here, the dealers enjoyed the benefit of being on the boards of entities that controlled the system's infrastructure — in CDS, the relevant entities were Markit Group Ltd. ("Markit") and ISDA, whose boards were dominated by representatives of the dealer community.

268.    The government investigations indicated that the dealers used their control over Markit and ISDA to prevent CMDX from launching with exchange-like features — instead insisting that a dealer stand on one side of every transaction, just like they did in the IRS market.[114]

---

[112]   Ciara Linnane & Karen Brettell, *NY Federal Reserve Pushes for Central CDS Counterparty*, REUTERS (Oct. 6, 2008), http://www.reuters.com/article/2008/10/06/cds-regulation-idUSN0655208920081006.

[113]   *CME Sees Up to Six Dealers Backing Credit Swaps Platform*, DOW JONES NEWSWIRE (Dec. 23, 2008), http://www.efinancialnews.com/story/2008-12-23/cme-sees-up-to-six-dealers-backing-credit-swaps-platform-1?ea9c8a2de0ee111045601ab04d673622.

[114]   European Commission, *Press Release: Antitrust: Commission Sends Statement of Objections to 13 Investment Banks, ISDA and Markit in Credit Default Swaps Investigation* (July 1, 2013), http://europa.eu/rapid/press-release_IP-13-630_en.htm.

269.     A series of private class actions were also filed against ISDA, Markit, and twelve CDS dealers alleging that they had conspired to boycott the exchange trading of CDS.  The cases were consolidated into a single action.  Though the defendants continue to deny liability, a class-action settlement was recently approved, whereby the defendants will collectively pay over $1.86 billion, and have agreed to injunctive relief that would help clear the way for exchange trading of CDS.[115]

270.     It is telling that today IRS SEF operators and customers lodge similar criticisms against the Dealer Defendants as those that prompted the DOJ and EC to investigate the CDS market, and spurred a series of class actions against the CDS defendants.  While the markets at issue are different, today's complaints by SEF operators — that the Dealer Defendants work together as a cartel to squash outright or take control over any actual or potential competitors — are reminiscent of the complaints that prompted the CDS investigations in 2008 and 2009 and litigation in 2013.

271.     As in the CDS market in 2008 and 2009, current IRS market participants lament how "the big banks control over half the liquidity in the market, giving them the power to decide which platforms survive, and which die."[116]  As a trader at one buy-side firm noted regarding the challenges that independent SEFs face, "[i]t's been a really tough environment for the start-up SEFs, [because] the market is designed not to allow new entrants."[117]  Similar to how the major CDS dealers allegedly used their control over the CDS market to block new entrants and

---

[115]   *See* Katy Burne, *Big Banks Agree to Settle Swaps Lawsuit*, WALL ST. J. (Sept. 12, 2015), http://www.wsj.com/articles/banks-wall-street-groups-agree-to-settle-credit-swaps-antitrust-case-1441988741.

[116]   Levinson, *supra* note 24.

[117]   *See* Mike Kentz, *Make or Break Time for SEFs*, INT'L FIN. REV. (May 2014), http:// www.ifre.com/make-or-break-time-for-sefs/21146200.fullarticle.

artificially inflate bid/ask spreads, current participants in the IRS market find themselves in an anticompetitive stranglehold, where promising new market developments are either entirely blocked, or taken over and neutralized, by the Dealer Defendants.

2. *The Dealer Defendants' Manipulation of ISDAfix*

272.    The Dealer Defendants have also allegedly manipulated ISDAfix, a key benchmark interest rate for a range of financial derivatives.  Beginning in November 2012, the CFTC sent subpoenas to the world's largest banks — including all or nearly all of the Dealer Defendants — and ICAP to determine whether the banks and ICAP were colluding to rig ISDAfix.[118]  In September 2014, the CFTC reportedly told the U.S. Department of Justice that its investigation had found "evidence of criminal behavior" involving manipulation of ISDAfix.[119]

273.    A series of private class actions were subsequently filed against fourteen banks that dominate the market for interest-rate derivatives and set ISDAfix, including each of the Dealer Defendants, as well as ICAP.  Similar to the allegations of the Complaint, the allegations of the ISDAfix class actions detailed how large banks shared information and worked together to manipulate the market for interest-rate derivatives for their own financial gain.  Though all defendant banks continue to deny liability, seven of them, including Dealer Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, JP Morgan, and RBS, have agreed both

---

[118] Matthew Leising, *CFTC Said to Subpoena ICAP Brokers, Dealers on Swap Prices*, Bloomberg (April 8, 2013), http://www.bloomberg.com/news/articles/2013-04-08/cftc-said-to-probe-icap-treasure-island-brokers-on-swap-prices

[119] Matthew Leising and Tom Schoenberg, *CFTC Said to Alert Justice Department of Criminal Rate Rigging*, Bloomberg (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2014-09-08/cftc-said-to-alert-justice-department-of-criminal-rate-rigging-i2z7ngfn.

to pay a total of $324 million to settle class action litigation, and to cooperate with counsel for the plaintiffs in further investigation of the manipulation of ISDAfix.[120]

## VI.   EQUITABLE TOLLING OF THE STATUTE OF LIMITATIONS DUE TO DEFENDANTS' CONCEALMENT OF THE CONSPIRACY

274.   Plaintiffs did not discover and could not have discovered through the exercise of reasonable due diligence that they were injured by Defendants' conspiracy to boycott Javelin and other all-to-all IRS exchange-like platforms, much less who caused that injury, until the fall of 2014, when Javelin learned that the Dealer Defendants and IDBs had agreed to continue name give-up in order to frighten the buy-side away from CLOB trading.

275.   By its very nature, Defendants' conspiracy to boycott exchange trading of IRS and refuse to deal with any entity that could facilitate such trading was self-concealing. Defendants executed their conspiracy, in large part, through secret meetings and discussions. These meetings were often, although not exclusively, carefully held under the cover of meetings connected with ostensibly independent market actors, like Tradeweb or ISDA.  Defendants used their positions in other industry consortia to meet regularly.  These meetings provided a seemingly legitimate front for Defendants' conduct even though their discussions often had no valid connection to the legitimate work of the boards, committees, and other entities.

276.   Defendants also met secretly at the homes of their senior executives and at restaurants in New York City.  The details of these meetings were secret, as were the identities of the individuals attending the meetings.  Defendants' internal communications and communications among each other were not public information, rendering impossible any ascertainment of the misconduct of individual Defendants or the fact of the conspiracy as a

---

[120] Bob Van Voris, *Seven Banks to Pay $324 Million to Resolve ISDAfix Claims* BLOOMBERG (Sept. 9, 2014), http://www.bloomberg.com/news/articles/2016-05-03/seven-banks-to-pay-324-million-to-resolve-isdafix-claims.

whole.  Defendants also regularly met in person, and communicated regarding their conspiracy via telephone, email, instant messaging, and Bloomberg messaging.  Plaintiffs had no way to access such communications.

277.    The Dealer Defendants' boycott of exchange-like trading platforms was, by necessity, secretive — the boycotts would have been rendered ineffective, and likely broken down, if their existence was made public.

278.    As a result of the self-concealing nature of the Defendants' collusive scheme, no reasonable person would have discovered Defendants' conspiracy to block the emergence of exchange trading of IRS before 2015 and later.

279.    In addition, Defendants repeatedly made false and misleading statements about the reasons for their collusive actions, in a purposeful effort to cause the public to believe that there were legitimate reasons for the lack of market evolution, and they represented that their actions were beneficial to the market.  Because of Defendants' affirmative efforts to mislead, Plaintiffs' continuing ignorance as to Defendants' conspiracy was not a result of a lack of due diligence.

280.    Defendants' success in hiding their collusion was facilitated by their tremendous clout in the financial markets, above and beyond the IRS market.  Market participants are acutely aware that they cannot afford to make enemies of the Dealer Defendants, and there is a great fear of retaliation.  Market participants are well aware that, even if they were to make tentative suggestions that the Dealer Defendants might be engaging in anticompetitive behavior, such suggestions could be met with retaliation that could cause severe financial harm.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of Section 1 of the Sherman Act)

281.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

282.     As alleged above, Defendants and their co-conspirators entered into and engaged in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-to-client IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly boycott Javelin and other entities that would introduce competition on IRS bid/ask spreads in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Such contract, combination, or conspiracy constitutes a naked, per se violation of the federal antitrust laws and is, moreover, an unreasonable and unlawful restraint of trade that lacks any countervailing procompetitive rationale.

283.     Defendants and their co-conspirators' contract, combination, agreement, understanding, or concerted action was without procompetitive justification and occurred within the flow of, and substantially affected, interstate commerce.

284.     Defendants and their co-conspirators' conduct in boycotting Plaintiffs cannot be plausibly justified as being intended to enhance overall market efficiency.  Among other things, Defendants' conduct leads to substantially wider bid/ask spreads than would occur through trading on an anonymous, all-to-all CLOB like Javelin.

285.     As a direct and proximate result of Defendants' scheme and concrete acts undertaken in furtherance thereof, Javelin has been injured and financially damaged in its business and property, including by having lost capital, profits and goodwill, by incurring substantial and unnecessary expenses, and by being seriously weakened, and threatened with

elimination, in amounts that are presently undetermined.  Plaintiffs' damages are directly

attributable to Defendants' illegal boycott of Plaintiffs' business and their allocation of the IRS

market among themselves.  Plaintiffs' injuries are of the type the antitrust laws were designed to

prevent, and flow from that which makes Defendants' conduct unlawful.

## SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act)

286.    Plaintiffs hereby incorporate each preceding and succeeding paragraph as though

fully set forth herein.

287.    Defendants' combination, conspiracy and arrangements alleged above, violate the

Donnelly Act, N.Y. Gen. Bus. Law §340, *et seq.*

288.    As alleged above, Defendants and their co-conspirators entered into and engaged

in a horizontal contract, combination, or conspiracy in restraint of trade to (1) allocate the dealer-

to-client IRS market and dealer-to-dealer IRS market between themselves, and (2) jointly

boycott Javelin and other entities that would introduce competition on IRS bid/ask spreads in the

market for IRS in the United States.

289.    Defendants and their co-conspirators' conduct in boycotting Plaintiffs cannot be

plausibly justified as being intended to enhance overall market efficiency.  Among other things,

Defendants' conduct leads to substantially wider bid/ask spreads than would occur through

trading on an anonymous, all-to-all CLOB like Javelin.

290.    As a direct and proximate result of Defendants' scheme and concrete acts

undertaken in furtherance thereof, Javelin has been injured and financially damaged in its

business and property, including by having lost capital, profits and goodwill, by incurring

substantial and unnecessary expenses, and by being seriously weakened, and threatened with

elimination, in amounts that are presently undetermined.  Plaintiffs' damages are directly

attributable to Defendants' illegal boycott of Plaintiffs' business and their allocation of the IRS market among themselves.  Plaintiffs' injuries are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## THIRD CAUSE OF ACTION
### (Unjust Enrichment)

291.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein.

292.     Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiffs.

293.     Plaintiffs seeks restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Business Relations)

294.     Plaintiffs hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

295.     Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants injured prospective business relations Plaintiffs had with its customers.

296.     Plaintiffs seeks restitution of the monies of which they were unfairly and improperly deprived, as described herein.

## PRAYER FOR RELIEF

297.     WHEREFORE, Plaintiffs, respectfully request that the Court:

a.      Find Defendants jointly and severally liable for the damages incurred by Plaintiffs;

b.      Award Plaintiffs treble damages;

c.      Award reasonable attorneys' fees and costs;

d.      Award all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity from the date of service of the initial complaint in this action;

e.      Decree that Defendants and their co-conspirators have unlawfully conspired to boycott Javelin in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

f.      Decree that Defendants have been unjustly enriched by their wrongful conduct and award restitution to Plaintiffs;

g.      Decree that Defendants have tortuously interfered with Plaintiffs' prospective business relations with its customers;

h.      Permanently enjoin Defendants from continuing their unlawful conduct, which has prevented competition from entering the IRS market, a market valuable to not only Plaintiffs but also to the nation's financial system and broader economy for the risk management and liquidity benefits it can provide; and

i.      Order such other, further, and general relief as is just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs, demand a trial by jury on all issues so triable.


Dated:  May 12, 2016

Respectfully submitted,

/s/ Thomas P. Ogden
David H. Wollmuth
Thomas P. Ogden
Ryan A. Kane
James J. Brennan
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
togden@wmd-law.com
rkane@wmd-law.com
jbrennan@wmd-law.com

*Attorneys for Plaintiffs*